## UNITED STATES

v.

## Kelton L. GOODE, Airman Recruit (E–1), U.S. Navy.

### NMCM 98 00383.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 11 Sept. 1996.

Decided 9 Feb. 2001.

---

Robert A. Parks, Civilian Defense Counsel.

LT Travis J. Owens, JAGC, USNR, Appellate Defense Counsel.

LT Frank Doherty, JAGC, USNR, Appellate Defense Counsel.

LT William C. Minick, JAGC, USNR, Appellate Government Counsel.

Before DeCICCO, Chief Judge, ANDERSON and PRICE, Appellate Military Judges.

DeCICCO, Chief Judge:

A general court-martial composed of officer and enlisted members convicted Airman Recruit Goode, contrary to his pleas, of attempted forcible sodomy, unauthorized absence, violation of a lawful general regulation, rape, and rape of a child under the age of 16 in violation of Articles 80, 86, 92, and 120, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 886, 892, and 920. In accordance with his pleas, he was acquitted of two specifications of forcible sodomy. The court members sentenced him to confinement for 10 years, forfeiture of all pay and allowances, and a dishonorable discharge. The convening authority approved the sentence, but in an act of clemency, he suspended confinement in excess of 9 years.

In this appeal, the appellant initially raised two assignments of error, one asserting that he was denied his right to a speedy trial, and the second alleging insufficiency of the evidence. Subsequently, through his appellate defense counsel, he submitted multiple assignments of error pursuant to *United States v. Grostefon*, 12 M.J. 431, 435 (C.M.A.1982). After the Government responded to these issues, we heard oral argument and allowed both sides to submit supplemental pleadings. Having considered all of the errors raised by the appellant, the Government's replies and the oral arguments of the parties, we have concluded that the findings and sentence are correct in law and fact, and, except as noted below, that no error materially prejudicial to the substantial rights of the appellant was committed. However, because all of the offenses occurred prior to 1 April 1996, we agree with the appellant that any forfeiture of pay taken under Article 58(b), UCMJ, 10 U.S.C. § 858(b), would violate the rule against the application of *ex post facto* laws, as held in *United States v. Gorski*, 47 M.J. 370, 375 (1997). We will direct corrective action in our decretal paragraph.

## I. Speedy Trial

The appellant's first assignment of error is that the Government failed to exercise reasonable diligence in bringing the appellant to trial and that he was prejudiced by an unreasonable delay.

■ The United States Constitution guarantees all persons the right to a "speedy and public trial." U.S. Const. Amend. VI. Additionally, the Due Process Clause of the Fifth Amendment also assures military accuseds the right to a speedy trial. Article 10, UCMJ, 10 U.S.C. § 810, extends that right to servicemembers confined prior to trial, and imposes a more stringent speedy trial standard than that of the Sixth Amendment. *United States v. Kossman*, 38 M.J. 258, 259 (C.M.A.1993); *United States v. Hounshell*, 7 C.M.A. 3, 21 C.M.R. 129, 132, 1956 WL 4557 (1956). Article 10, UCMJ, provides that when a servicemember is confined, "immediate steps" must be taken to try him or to dismiss him and release him. There is no "magic number" of days in pretrial confinement which would give rise to a presumption

of an Article 10, UCMJ, speedy trial violation. *United States v. McLaughlin,* 50 M.J. 217 (1999); *Kossman,* 38 M.J. at 261.[1] Rather, the measurement for compliance with the provisions of Article 10, UCMJ, is whether the Government exercised "reasonable diligence" in bringing charges to trial. *Kossman,* 38 M.J. at 262.

■ In *Kossman,* the court expressly deferred to the expertise of military judges to analyze and determine whether the delay was justified, or whether the Government could have gone to trial much sooner but negligently or spitefully chose not to do so:

> We do not apprehend that military judges will approach the Article 10 mandate to take immediate steps in a mean-spirited fashion. Undoubtedly, military judges are far more sensitive than are we to the realities of military practice.

> If our decision today vests military judges with a degree of discretion, so be it. Judges who can decide difficult questions such as whether a confession was voluntary can readily determine whether the Government has been foot-dragging on a given case, under the circumstances then and there prevailing.

*Id.,* at 261–62. A military judge's conclusion of whether an accused received a speedy trial is a legal question that is reviewed *de novo. United States v. Doty,* 51 M.J. 464, 465 (1999). The military judge's findings of fact are given substantial deference and will be reversed only for clear error. *Id.*

■ In this case, the appellant was in pretrial confinement for 85 days prior to arraignment. At the assembly of the court-martial and *voir dire,* the appellant had been in pretrial confinement for 337 days. A detailed chronology of the events in this case was agreed upon by the parties as a stipulation of fact. Appellate Exhibit XVI. The military judge adopted this stipulation into his findings of fact. Record at 234–36; 238–39. We adopt his findings of fact as our own and recount them below.

The appellant was placed in pretrial confinement on 28 September 1995 based on reasonable suspicion that he had raped two separate victims. Charges for both rapes were preferred on 13 October 1995. On 19 October 1995, the convening authority ordered a pretrial investigation pursuant to Article 32, UCMJ, which occurred on 8 and 17 November 1995. The investigating officer recommended trial by general court-martial on 30 November 1995, and the convening authority referred the charges to a general court-martial on 10 December 1995.

The appellant was arraigned on 21 December 1995, 85 days after being placed in pretrial confinement. Record at 11. At that session, the military judge scheduled the trial for the week of 5 February 1996. Record at 15, 17. At an Article 39(a), UCMJ, session on 22 January 1996, the appellant informed the court that he had made a request for an individual military counsel. Record at 19. After admonishing the appellant for waiting to make his request at such a late time when he had been advised of his rights to counsel "a month ago" at the last session, the military judge told the appellant in no uncertain terms that "I am not changing the trial date" from 5 February 1996. Record at 20. At this point, the detailed defense counsel admitted that he had "grave concerns" about his own upcoming availability. Record at 21. The military judge advised the detailed defense counsel to alert his superiors that "the judge does not intend to change his court date." *Id.* Also at this session, the detailed defense counsel mentioned for the first time a discovery issue he considered outstanding, regarding deoxyribonucleic acid (DNA) test results on materials submitted by Florida police to a civilian state crime lab. Record at 23. This testing pertained to an incident from June 1995 in Volusia County, Florida.

On 4 October 1995, the Naval Criminal Investigative Service (NCIS) had forwarded a rape evidence kit in the case of an incident that took place in September 1995 at the Mayport Naval Station to the Army Criminal Laboratory at Fort Gillem, Georgia. The

---

1. *But see* Rule for Court-Martial 707, Manual for Courts-Martial, United States (1995 ed.)(the edition in effect at the time of the appellant's trial).

serology report was obtained in late December 1995. The Government had not sought a serology report from the alleged victim in the Volusia County incident. After receiving a discovery request from the defense, however, the prosecution requested that testing be done. The testing of this evidence by the civilian laboratories was not completed until May 1996. It was the delay in the DNA testing by the State of Florida relating to the Volusia County incident that forms the primary basis for the appellant's speedy trial argument. In particular, the trial defense counsel argued that "[i]t is not reasonable to allow an agent of the government to sit on a sample for over 5 months when a viable alternative existed. Diligence requires that when the government knew there would be a delay it inquire among its vast resources to locate an alternative." Appellate Exhibit VI at 5, 11 (Defense Motion to Dismiss). The speedy trial motion was litigated on 21 May 1996. Record at 214-42. Ultimately, the military judge denied the appellant's motion to dismiss. Record at 242.

We find that the Government used reasonable diligence in bringing the appellant to trial. First, we note this was a complex double-rape case ultimately filling over 3,000 pages of transcript for our review. Second, the Government represented that it "was ready to try th[e] case on 5 February 1996." Appellate Exhibit VIII at 1 (Government's Answer to Motion to Dismiss). The delay in this case was almost entirely occasioned by the delay in receiving the defense-requested DNA test results, which were in the control of the Florida state authorities. Although the Government demonstrated its good faith by requesting expedited processing of the DNA samples, ultimately neither the civilian Florida crime lab nor the DNA samples was under the control of the U.S. Government. Record at 26, 27; Appellate Exhibit XVI. Third, the military judge was himself diligent in ensuring prompt resolution of pretrial issues,[2] and he was thorough in ruling on the motion to dismiss. Finally, it was the trial counsel, not the defense, who suggested a severance of the charges so that one rape charge could be tried while awaiting DNA test results on the other rape charge. Appellate Exhibit VIII at 12. From these circumstances, we conclude that the Government did not "negligently or spitefully" choose to delay the trial. *Kossman*, 38 M.J. at 261.

We further find that any delay inured to the benefit of the appellant who used the time to prepare his case and resolve issues related to his counsel. We note that the military judge found that the defense was not ready to proceed on the scheduled date. Record at 240. Indeed, the appellant used the delay from the original 5 February 1996 trial date to prepare for trial in the following ways: (1) by filing discovery requests on 1, 6, 8 March and 23 April 1996; (2) by requesting funding for an expert DNA consultant on 29 February 1996; (3) by requesting the production of out-of-the-area defense witnesses on 5 March 1996; (4) by requesting depositions on 5 March 1996; and (5) by making a third request for individual military counsel on 26 March 1996. Record at 44, 46, 48; Appellate Exhibits I, II, III, V, and XVI.

Accordingly, the appellant was not denied his right to a speedy trial under Article 10, UCMJ. We also find that the appellant's Constitutional rights to a speedy trial were also not violated. *See Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Balancing the four factors of *Barker*, i.e., the length of the delay, the reasons for the delay, the assertion of the right and the prejudice to the appellant, there was no Sixth Amendment violation. We reach the same conclusion regarding the appellant's Fifth Amendment Due Process rights. *See United States v. Vogan*, 35 M.J. 32, 33-34 (C.M.A. 1992); *United States v. McGraner*, 13 M.J. 408, 413-14 (C.M.A.1982).

## II. Sufficiency of the Evidence

The appellant challenges the legal sufficiency of the evidence to support the unauthorized absence offense (Charge I and its sole supporting specification) and the factual

---

**2.** Article 39(a), UCMJ, sessions were held on 21 December 1995, 22 January 1996, 8 February 1996, 26 March 1996, and 10 April 1996. Record at 1, 18, 29, 43, 57. R.C.M. 802 conferences were held on 20 December 1995, 22 January 1996, 25 January 1996, 1 February 1996, 8 February 1996, 1 March 1996, and 6 March 1996. Record at 4, 18, 30, 43.

sufficiency of the evidence regarding the attempted forcible sodomy of one under the age of sixteen (Charge IV, Specification 1), rape (Charge III, Specification 1), rape of one under the age of sixteen (Charge III, Specification 2), and violation of a general regulation (Charge II, Specification 2). After careful consideration of the record, we find the evidence both legally and factually sufficient to find the appellant guilty, beyond a reasonable doubt, of all of the charges and specifications of which he was convicted at trial.

This Court's standard of review for sufficiency of the evidence is set forth in Article 66(c), Uniform Code of Military Justice:

(c) In a case referred to it, the Court of Criminal Appeals may act only with respect to the findings and sentence as approved by the convening authority. It may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved. In considering the record, it may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses.

 Further, this standard and its application have been recognized and defined by the Court of Appeals for the Armed Forces:

under Article 66(c) of the Uniform Code, 10 U.S.C. § 866(c), the Court of [Criminal Appeals] has the duty of determining not only the legal sufficiency of the evidence but also its factual sufficiency. The test for the former is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of [Criminal Appeals] are

themselves convinced of the accused's guilt beyond a reasonable doubt.

*United States v. Turner*, 25 M.J. 324, 324–25 (C.M.A.1987).

 In making such factual determinations, we are guided by the principle that "[r]easonable doubt, however, does not mean the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R.1986). 'The factfinders may believe one part of a witness' testimony and disbelieve another.' *United States v. Harris*, 8 M.J. 52, 59 (C.M.A.1979). So, too, may we. Art. 66(c), UCMJ, 10 U.S.C. § 866(c) .'" *United States v. Lepresti*, 52 M.J. 644 (N.M.Ct.Crim.App.1999). It is with these standards of review that we now examine the evidence adduced in this case.

 DH graduated from high school in St. Charles, Missouri, in June 1995. She participated in a senior trip to Daytona Beach, Florida, where she, and the group with which she traveled, stayed at the Fountain Beach Resort Hotel. Record at 1675–76.

ET3 Jeremy Miller and the appellant were friends from boot camp. In June 1995, ET3 Miller was attending Nuclear Power School at Orlando, Florida, and met the appellant who was visiting some other friends at the command. Record at 1557. On Thursday, 15 June 1995, ET3 Miller and the appellant went to Daytona Beach where they went to a club named "Checkers." While they were there, ET3 Miller saw DH. ET3 Miller saw the appellant talk with DH. During the course of the evening, the appellant told ET3 Miller that he (the appellant) would like to have sex with DH. Record at 1559–62.

Later in the evening, ET3 Miller and the appellant were in the Fountain Beach Hotel. One of the chaperones of the student group spoke with the appellant and asked the appellant and ET3 Miller to leave the hotel since they were not with the student group. The appellant took exception to this arguing that "we could wander if we wanted to." Eventually, police arrived and talked with the appellant. The appellant told ET3 Miller that they had to leave for the night (of 15 June 1995). Record at 1567.

DH was in Daytona Beach on Friday, 16 June 1995. That evening she "started off at Checkers" where she, and a group of friends, "played pool, . . . danced, they had a little bit of [karaoke] that night." Record at 1678–79. DH acknowledged that, although she was only 18 at the time, she had a fake ID and drank approximately 3 beers at Checkers. DH testified that she left around closing time. Closing time was 0130 (on Saturday morning, 17 June 1995). DH estimated that she left "anytime between 11, 12 maybe." Record at 1679.

After leaving Checkers, DH and her friends returned to their hotel where they changed into swimming suits (a bikini in her case) and went to the beach near the hotel. DH estimated she was there about one and one-half hours. She spent this time kicking around in the water, and walking up and down the beach. DH, once again, returned to her hotel. Record at 1680.

DH re-entered the Fountain Beach Hotel through the "back door," the door closest to the beach. As she walked through the lobby, she saw the appellant. DH was with her boyfriend, Brad. The appellant spoke to DH and to Brad. Record at 1570–71, 1681. DH went on to her room where she put on a t-shirt and proceeded to Brad's room where there was a group of about 15 people listening and dancing to music. After about one hour, DH returned to her room for her camera so she could take some pictures of friends. She did so and took several pictures. Rather than set the camera down in Brad's room, DH took it back to her room. DH was going to see some friends who were on the 4th floor (one floor down from her room and Brad's room). Record at 1682–83.

At about this same time, ET3 Miller and the appellant were approached by security at the Fountain Beach Hotel. The appellant was advised that he needed to leave the hotel (because of the incident the previous evening). ET3 Miller testified that, before the appellant left, he (the appellant) went up on the elevator to find DH and take her with him. Record at 1572.

On her way to the stairs, DH encountered the appellant who was standing in the elevator with the door "propped open." DH said that she was going to the 4th floor; the appellant said, "Why don't you just take the elevator?" DH said that she was only going one floor, but the appellant replied, "Well, the elevator is here." DH entered the elevator. When DH attempted to push the 4th floor button, the appellant said, "I've already got it." However, when the doors opened, the elevator was on the first floor. Record at 1682–83. ET3 Miller observed DH and the appellant leave the elevator. Miller did not know what had gone on between them upstairs. Record at 1572.

At this point, the appellant asked if she (DH) were coming along. DH replied, "No, I have to go back up to the fourth floor." The appellant said, "No, you don't." He grabbed her wrist and told DH to be quiet or he would "break [her] f——ing neck." Record at 1684. The appellant walked DH out of the hotel to his car. He opened the door, and DH entered the car. The appellant shut her door. DH testified that "Mr. Miller" was with them at this time and that there was an attendant at the front desk in the lobby as they passed through talking to someone at the counter. The appellant drove to the Mayan Inn Hotel which was "a couple of buildings away." Record at 1572–73, 1684–85.

When they arrived at the Mayan Inn, the appellant took DH up to a room where he was apparently registered. During this time, DH testified that she was scared and tried to "convince [her]self that [she] was going to be okay." Since there was another person (Miller) she thought "maybe it wasn't for real." Record at 1685.

In the room, DH asked the appellant when he was going to take her back to her hotel, telling him, "I need to get back." The appellant offered DH a beer, but she did not want it. The appellant kept insisting so she "took a couple of sips . . . put it to [her] mouth . . . sat it down on the dresser." Record at 1686.

DH remained in the appellant's hotel room for about an hour. The appellant told DH that he would take her back to her hotel (the Fountain Beach Hotel). Miller remained behind. The appellant and DH entered the appellant's car. When the appellant ap-

proached the street from the Mayan Inn, he turned right onto the street rather than left which would have taken him toward the Fountain Beach Hotel. In other words, he turned onto the street heading away from, rather than toward, the Fountain Beach Hotel. The appellant stated that he needed to stop at an ATM machine to obtain some money to buy gasoline. As he drove past a 7–11 convenience store, where DH knew there to be an ATM which her friends had been using, DH pointed it out to the appellant. The appellant replied that his ATM card did not work at that machine. At this point, DH testified that she "started to panic." While they were driving, she blacked out because she was scared. Record at 1687.

DH regained consciousness and found the car was stopped and "there was a blanket covering the windows in the car." The appellant started to climb around on her seat. DH testified that he "took my shirt off, and then he grabbed at my bottom, I heard them rip and they were off." Record at 1688.

DH cried and told the appellant, "No." He had one hand behind her neck and another over her mouth, and he told her he would snap her neck if she screamed. At this time, the appellant forced his penis inside DH's vagina. DH told the appellant she was having trouble breathing. The appellant lowered one of the car windows slightly. DH blacked out again. When she again became conscious, she was on a blanket on the beach. The appellant forced her to lie down on the blanket, and he again forced his penis into her vagina. DH was still crying and saying, "No." DH testified that she "had better like it" and that she had "better be quiet, he could still snap [her] neck." Record at 1689–90.

DH told the appellant she "had to go to the bathroom." He let her up, and she headed toward the water. DH testified that she thought of trying to drown herself in the water. The appellant intercepted her and asked where she was going. DH said she was going into the water to relieve herself. The appellant told her just to squat down on the sand. DH did so and urinated. Record at 1690. While DH was urinating, the appellant was standing above her, and he told DH

to suck his penis. The appellant's penis was erect right above her head. DH turned her head, got up, and started to run. Record at 1697. The appellant caught up with her and caught her by the ankle causing her to fall down. Record at 1690. The appellant dragged DH back to the blanket and, for a third time, forced his penis into her vagina. DH never consented to any of the sexual activity that the appellant engaged in with her. Record at 1703.

When the appellant was finished, he walked back to the car, and DH put on her clothes. The appellant had DH fold up the blanket. At trial, DH identified the blanket that the appellant used to drape the windows and which he laid out on the beach. DH asked the appellant to take her back to her hotel, but the appellant could not find the key to his car. Both DH and the appellant tried to find the key but could not. DH asked the appellant if he could hot wire the car to get it started; he could not. Record at 1691.

DH went out on the street. Although the first car passed her by, she was able to flag down the second vehicle to approach, a white truck driven by Mr. Buckels. Record at 1635, 1693. DH walked up to the driver and whispered, "Help me, help me." Record at 1638, 1649, 1694. Mr. Buckels asked if she were having car trouble. DH replied, "No, just help me." The driver motioned with his head and had the door open when she went around to the passenger side. DH asked the driver "to please go." DH testified that she heard the appellant hit the side of the truck as it started to move away. Record at 1694. Mr. Buckels testified that DH was "hysterical ... crying ... excited." Record at 1649.

DH asked Mr. Buckels to take her back to her hotel. He asked if she was all right, and DH replied that she had been raped. Mr. Buckels suggested that he take her to the police station, which he did. Record at 1656, 1695.

At the police station, Detective Doubleday drove DH back to the scene because she (Det. Doubleday) needed to have DH identify someone the police had found. Record at 1695. Detective Doubleday took DH to the

scene where she identified the appellant saying, "Yes, it was him." Detective Doubleday also took DH to the Rape Crisis Center where a number of tests were performed and samples collected. Record at 1696, 1716.

In his examination of DH at trial, as well as in his briefs to this Court, the appellant has presented a number of issues which he argues so undermine the credibility of DH as to render the evidence factually insufficient to sustain his conviction. These issues include:

(a) the fact that DH was subpoenaed to testify;

(b) the fact that DH's mother was provided travel expenses to accompany her daughter to the trial;

(c) the fact that DH had conferred with trial counsel prior to her testifying in the case;

(d) the fact that DH had provided a statement to Detective Doubleday of the Ormand Police Department which differed in one or more respects from her trial testimony;

(e) the fact that DH had provided a statement to Officers Dowell and Ramsdale of the Daytona Beach Police Department which differed in one or more respects from her trial testimony;

(f) the fact that DH had provided a statement to Special Agent Perritt of the Naval Criminal Investigative Service which differed in one or more respects from her trial testimony;

(g) the fact that DH had conferred with LT Johnson, the original trial counsel in the case, and with LT Finley, the current trial counsel in the case;

(h) the fact that DH chose not to attend the Article 32, UCMJ, investigation;

(i) the fact that DH had provided a statement to "Bobbie" of the Rape Crisis Center which differed in one or more respects from her trial testimony; and

(j) the fact that DH had lied about her age to purchase alcoholic beverages while in Daytona Beach.

Many other issues were identified by the appellant during cross-examination and in his brief to this court. However, these are representative, for the purposes of this discussion, of the kinds of issues urged by the appellant to find that the evidence (specifically the testimony of DH) is insufficient to find him guilty beyond a reasonable doubt.

We will discuss some of these issues. For example, the appellant suggests in his brief, in part of his discussion about the credibility of DH, that it is incredible that an underage person who, a short time earlier, had purchased and consumed alcoholic beverages with a false ID, would be reluctant to partake of alcoholic beverages in the appellant's hotel room. However, DH's testimony shows that it was not a matter that she had developed an aversion for alcoholic beverages, but rather, under the circumstances of being forced from her hotel and taken to a stranger's hotel room, she simply did not desire to drink the beer.

Further, the appellant notes that the bikini bottoms were later identified and found not to be torn. There is a potential discrepancy between her testimony "I heard them rip" and the physical appearance of the garment. Like the fact-finder at trial, when this court weighs the credibility of witnesses, we determine whether discrepancies in the witness' testimony resulted from an innocent mistake, including lapses in memory, or a deliberate lie. We do not conclude that, because DH testified that she heard a ripping sound as the appellant removed her bikini bottoms and because her bikini bottoms were later found intact, DH was being deliberately untruthful. She may very well have heard a ripping sound either from the friction of two items passing over one another rapidly or from some other item being torn.

The appellant argued at trial that DH was inconsistent and incredible because she did not tell "Bobbie" at the Rape Crisis Center that she had intercourse with her boyfriend Brad on Thursday night. Record at 1730. However, an examination of Appellate Exhibit CIX, the interview form of DH by the Rape Crisis Center, shows that the literal question was "Have you ever had sexual intercourse?" And, DH's answer was, "Yes." As DH stated at trial, Bobbie did not ask when DH had had intercourse, and DH did not volunteer it. We conclude that it was

reasonable, with DH being so close to the time of the event, for her not to go beyond answering the questions as put to her. There is also the issue urged by the appellant that DH had told Bobbie that there were two attackers, not one. Record at 1732. However, again, an examination of Appellate Exhibit CIX, shows that this was a form used by the Rape Crisis Center to record the answers of an alleged victim, a form which there is no evidence that DH had a chance to review. Thus, we are left with Bobbie's recording of what she understood DH to say, not a statement of DH herself.

At another point, the appellant focuses on DH's statement to the Naval Criminal Investigative Service that "Kelton could not find his keys." Appellate Exhibit CVII at 2. But at trial, DH testified that there were two search episodes. Record at 1826. The narration in Appellate Exhibit CVII that the search lasted "about one half hour" does not contradict the idea that there were two episodes of looking for the keys.

The appellant argues that DH's testimony is unworthy of belief because the narration she provided to various law enforcement agents was different. In evaluating this argument, the court is mindful of the situation that various appellants argue that a victim who tells the same, identical story time and again has "practiced" it to the point that it is not worthy of belief. A witness, or victim, should not be faced with the alternatives that, if on the one hand the witness' story is too consistent, it is unworthy of belief as manufactured, and, if on the other hand it is not consistent, it is unworthy of belief as fantasy. Rather, each witness', or victim's, testimony must be evaluated by its own compelling nature (or lack thereof). We are not persuaded by this argument of the appellant.

The appellant also argues that "no deoxyribonucleic acid (DNA) profile for a male could be found in [DH's] vaginal swabs, smears or on her panties." *Appellant's Supplemental Brief of 28 Dec 2000 at 9.* The testimony at trial was that there was "insufficient DNA" which could have resulted from too few sperm cells to produce a result (one way or the other) or degradation (decomposition) of the DNA to the point that it was no longer

present. Record at 167–68. The appellant's argument that the semen on DH's bikini bottoms (because the acid phosphatase test did confirm semen on the garment, Record at 164) "most probably [came from] sex with Brad" on Thursday night, after which DH spent more time in ocean water, the hotel swimming pool and took a shower, is simply speculation and is unpersuasive.

Reduced to its basics, this court is left with the task given to all fact finders, to sort out the testimony and to determine the credible testimony, what that evidence proves directly, and what, if any, logical inferences spring from that evidence. The appellant argues that DH's behavior is contrary to human experience. However, not "every departure from the norm of human behavior" affects the credibility of a witness. *United States v. Long,* 6 C.M.R. 60, 70, 1952 WL 2276 (U.S.C.M.A.1952). Whether DH behaved differently than an observer might expect the victim of a rape to act is a factor to be considered. However, we find nothing in DH's testimony, or that of other witnesses or documentary evidence, to be such as to raise a reasonable doubt as to accused's guilt. DH's testimony, along with the other testimonial and documentary evidence, convinces us, beyond a reasonable doubt that the appellant is guilty of Charge III, Specification 1 (rape of DH).

The appellant predicates his insufficiency argument regarding the unauthorized absence offense on the theory that, if he is found not guilty of the rape of DH, his absence, while incarcerated by the Florida authorities for this offense, is not unauthorized. Having concluded that the appellant did commit the rape of DH, we similarly conclude, beyond a reasonable doubt, that his absence, while held by Florida authorities, was unauthorized.

■ Having addressed the appellant's allegations of insufficiency regarding the alleged offenses involving DH in June 1995, we turn to the September 1995 alleged offenses involving SR. SR had planned to spend the night at the apartment of a friend, Jennifer Lipshin, on September 28, 1995. Record at 1347–48. SR had turned 14 years of age on March 20, 1995. Record at 1347. SR and

Lipshin were talking with a friend near a bus stop on Mayport Road in Mayport, Florida, when the appellant drove by with another person named "Scott." The appellant and Scott asked SR and Lipshin how old they were. SR replied that she "was 19, or turning 19." Lipshin told them that she (Lipshin) was 20. The appellant and Scott asked if SR and Lipshin wanted to go for a ride. SR and Lipshin agreed. Record at 1349. The appellant and Scott asked the girls if they drank beer. Lipshin replied that she didn't like beer, that she drank liquor, and that she liked gin and juice. SR replied that she "wasn't much of a drinker." The group purchased a bottle of gin and juice and proceeded to the enlisted barracks at Naval Station, Mayport, Florida. Record at 1350. Once in the barracks, either the appellant or Scott produced some ice. The appellant provided SR with some gin and juice which she drank. Record at 1351, 1486. After the four drank and talked for a few minutes, SR said she had to use the restroom. Lipshin and Scott waited outside the restroom door while SR entered the restroom. However, the appellant followed SR into the restroom "and tried to kiss on [her]." SR told the appellant that she had a boyfriend and that she was a virgin. SR testified that she did not actually have a steady boyfriend, but she told the appellant these things thinking that it would cause him to leave her alone. When SR left the restroom, Scott was gone. Lipshin told SR that she (Lipshin) had told Scott that SR was really only 14 years old, and Scott left. Record at 1352. Upon their returning to the room in the barracks, the appellant "tr[ied] to kiss on Jennifer." However, she laughed at him, and the appellant "started to kiss on [SR]." Lipshin told the appellant that "he was pathetic because [SR] was only 14." Record at 1353, 1359. The appellant replied, "It do[es]n't matter, I like her anyway." SR told the appellant that she [SR] was, in fact, 14 years old, and the appellant "still kept trying to kiss on [her]." Record at 1359. SR was telling the appellant, "No," and Lipshin also told the appellant, "When a girl says no, she means no." Record at 1361.

SR and Lipshin told the appellant that they wanted to go home. The appellant told them that they would "have to wait for the switch of the guards," and he said he could take Lipshin but not SR because she [SR] was only 14. The appellant left the room with Lipshin. Record at 1361.

SR relaxed on the bed. She thought she might have dozed off because it seemed like "the next minute [the appellant] was back." The appellant took off his shirt and told SR that Lipshin and Scott had gone to get gas and "they would be right back to get [her]." Record at 1367. The appellant started to pull on SR's pants. She told him, "No," and stood up. The appellant "nudged" her back down and, again, tried to pull off her pants. The appellant eventually removed SR's pants, shirt, bra and panties. Record at 1369–70. SR told the appellant to stop, that she did not want to do this, and that she was not ready for it. The appellant responded that he was not doing anything wrong. The appellant started to put his penis in SR's vagina, and she told him to stop, that she did not want to do it. SR said, "Please don't rape me." The appellant told SR that he "wasn't going to" rape her but "if [she] didn't be quiet he was going to knock [her] out and rape [her]." Record at 1370. SR testified that the appellant put his penis "about half way" into her vagina. SR told him to stop and that she was not ready to lose her virginity. The appellant told her that she was not losing her virginity, and, when SR "started to get a little louder ... he told [her] to 'shh' and then put his hand over [her] mouth." Record at 1376. As SR was telling the appellant that she did not want to do this, the appellant told her to take his penis into her mouth. When she said, "No," the appellant replied, "Well, then you are going to have to f—k me." SR told the appellant, "No." The appellant "placed [her] mouth on his penis." SR did not want to do so. She pulled away and spit on the floor. Record at 1378. Eventually, the appellant got off of SR and told her to get dressed. He told her to stop crying. SR replied, "But, you raped me." The appellant replied, "No, I didn't." SR said, "I told you to stop." The appellant replied, "I didn't hear you and nobody else did." Record at 1380. The appellant drove SR back to the bus stop. From there, SR returned to Joanne's apartment. Joanne

told SR that she should report what happened to the police. SR called the civilian police and they took SR to the base where she spoke with Special Agent Barbara O'Connel of Naval Criminal Investigative Service. Record 1382.

There were two particular areas of dispute regarding corroborative evidence of SR's narration of events. First of all, the defense disputes the DNA evidence linking the appellant to SR. Mr. McCaffrey, of the U.S. Army Criminal Investigation Laboratory, Fort Gillem, Georgia, testified about his comparison of samples from the appellant and samples from the panties worn by SR on 28 September 1995. Mr. McCaffrey testified about both the scientific background of DNA testing and the results of his application of those principles to the evidence in this case. Mr. McCaffrey testified that "lane 13," the DNA specimen which derived from a sample of the semen found on SR's panties, was consistent with "lane 4," the DNA which derived from a sample of the appellant's blood. Record at 2222, 2227. Based on the databases used by Mr. McCaffrey, he testified that one out of 1,510,009 persons would have a similar DNA pattern to that found on the panties. Record at 2295.

The defense thoroughly cross-examined Mr. McCaffrey about numerous factors related to the credibility of his testimony ranging from possible biases as a government employee and one who normally testified for the prosecution, through issues related to the scientific principles and theory of DNA testing, to the circumstances of the analysis in this case and factors which might have led to inaccurate results. Record at 2309 2335. Having thoroughly reviewed his testimony, we are persuaded that his testimony forcefully and convincingly supported his conclusion that the DNA pattern from the appellant's blood specimen was consistent with the DNA pattern found on SR's panties.

The second area of specific dispute regarding corroboration of SR's testimony related to damage, or lack thereof, to SR's genitalia. The defense called Dr. Feegel, who testified that he had examined the assessment of SR conducted at the child sexual assault program. Record at 2663, 2677. Dr. Feegel testified that "one would expect more likely than not that there would be injury" to the hymen of an immature female if there were "forcible" intercourse and if there were a "significant disparity [of size] between" the male and the female. Record at 2688. The examination of SR after the incident recounted that the hymen was "within normal limits." Prosecution Exhibit 35 at 2. On the other hand, Dr. Feegel agreed that, if the female were threatened with physical violence to compel her lack of resistance, the intercourse would not necessarily be "forcible" from a medical standpoint and that the kind of injuries he discussed in terms of forcible intercourse might not occur. Record at 2695, 2698.

On the other hand, the government called Dr. Whitworth on rebuttal. Record at 2717. Dr. Whitworth testified that SR's genitalia were "fully estrogenized" and that she was "post-pubescent." He testified that in forty percent of cases where penetration was shown to have occurred there were no findings related to lacerations or injuries. Record at 2721. Dr. Whitworth also testified that, while he agreed that the hymen is fibrous, the hymen also "stretches remarkably." He further testified that, while it was once commonly held that the hymen had to show damage to corroborate penetration, "it is not uncommon to see sexually active adolescents and adults who still have an intact hymen." Record at 2722–23. As with the DNA evidence, we have thoroughly reviewed the testimony on this subject, and we are persuaded that the absence of damage to SR's hymen is explainable by the medical testimony. This is true from the perspective that the threats to SR which caused her to reduce her physical resistance would tend to diminish injury to the hymen. It is also true from the perspective that SR's genitalia were sufficiently mature that the acts described could be performed without damage to the hymen.

As with DH, the appellant has pointed to various discrepancies between SR's testimony at trial and prior statements she made. The appellant has also pointed to differences between SR's recollection and the recollection of what others remember her saying or

doing. The defense has also raised issues of motive to fabricate based on SR's concerns for her mother's being upset by where she went, who she went with, and what she did. However, as with DH, we are not persuaded that these differences or possible motives to fabricate defeat the convincing character of her testimony.

For example, the appellant makes much of whether SR did or did not have a curfew imposed by her mother. SR said she did not have such a curfew; other witnesses said that she did. Nevertheless, the appellant did make the point that SR's behavior that evening (allowing herself to be driven off by a stranger) was outside the limits set by her mother and that her mother was not happy that SR had done so. That having been said, we are not persuaded that this formed a basis for SR falsely to accuse the appellant of rape in order to defuse the anger of her mother. Having carefully considered all of the evidence presented by both parties concerning the offenses involving SR, we find beyond a reasonable doubt that the appellant raped SR, who was at the time under the age of sixteen years of age, that the appellant attempted to commit forcible sodomy upon SR, and that the appellant provided alcoholic beverages to SR, who was under the age of twenty-one years of age at the time, in violation of Commander, Naval Base Jacksonville Instruction 1700.1 dated 9 August 1994, to which instruction the appellant was subject at the time.

With respect both to DH and to SR, we have also carefully considered the testimony of the several character witnesses civilian and military (testifying both in person and by documentary means). Fully recognizing the legal principle that such evidence (supporting the inference that a person of good character is less likely to commit a crime) can form the basis for a reasonable doubt, our weighing of the evidence does not find that such evidence overcomes the testimony of DH and SR and the other evidence presented in the case, and we are fully persuaded, beyond a reasonable doubt, that the appellant raped DH, was in an unauthorized absence status, raped SR, attempted to commit forcible sodomy upon SR, and provided alcoholic beverages to SR.

## III. Ineffective Assistance of Counsel

### a. Testimony of Dr. Mueller and Dr. D'Eustachio

 The appellant argues that his trial defense counsel was ineffective in failing to call Dr. Mueller or Dr. D'Eustachio, defense experts, to testify about the DNA testing with regard to the alleged sexual assault against SR during the defense case.

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court set forth the standard for reviewing claims of ineffective assistance of counsel on appeal. The court stated:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. This standard has been adopted by the Court of Appeals for the Armed Forces in reviewing appellate claims of ineffective assistance of counsel. *United States v. Scott*, 24 M.J. 186, 188 (C.M.A.1987).

Was trial defense counsel's performance deficient? The appellant's argument on appeal proceeds along the following line of argument. Regarding the offenses involving SR, the government witness on the DNA evidence, Mr. McCaffrey, testified that the DNA from the appellant's blood could not eliminate him from having supplied the DNA found in the semen on SR's panties. Mr. McCaffrey testified that the odds of a randomly selected person having the same DNA

pattern was one "out of a million." Record at 2295.

Dr. Mueller had testified for the defense during pretrial hearings regarding the validity of the Army Criminal Investigation Laboratory (ACIL) practices and conclusions. Record at 586. Dr. Mueller testified that the Federal Bureau of Investigation (FBI) and the ACIL used similar techniques. Record at 590. Dr. Mueller testified that he had concerns about both the FBI and ACIL procedures. Record at 634. Indeed, the only other person or institution of whom Dr. Mueller spoke with approval was Dr. Cohen of the University of Chicago. Record at 614. Dr. Mueller testified that, since no laboratories had done more than "a couple hundred proficiency tests" of their methodology, no one laboratory can be said to have an "error rate less than one in a couple hundred." Record at 629. Nevertheless, even according to the appellant, Dr. Mueller could not exclude the appellant as the source of the DNA found in the semen on SR's panties. The most that he could say was that, if one assumed a sufficiently high error rate at ACIL, the odds of a randomly chosen person having left the DNA on SR's panties was one in one hundred. Record at 628; Appellant's Supplemental Brief at 14.

Dr. D'Eustachio also testified for the defense during pretrial hearings regarding the testing procedures of the ACIL. Record at 497. Dr. D'Eustachio testified that the ACIL result was subject to question because the laboratory had not done variance studies, essentially quality control studies, of its work product. Record at 512. Nevertheless, as with Dr. Mueller, Dr. D'Eustachio testified that the appellant's DNA in the ACIL workup was consistent with the DNA found in the semen on SR's panties. The most that he could say was that, if the lab had committed an error such as allowing contamination of the sample from the panties with the sample from the appellant, the result would be questionable. Record at 573; Appellant's Supplemental Brief at 14.

The appellant complains that his trial defense counsel did not call Dr. Mueller or Dr. D'Eustachio to testify on the merits before the members. Certain facts are self-evident

from the record. These include the fact that Dr. Mueller and Dr. D'Eustachio were called to testify during the pretrial hearing stage, the fact of what Dr. Mueller and Dr. D'Eustachio would have to say, and the fact that Dr. Mueller and Dr. D'Eustachio were not, in fact, called during the defense's case on the merits. In his affidavit the trial defense counsel, LT Swergold, stated that, once the military judge determined that DNA evidence would be received and once LT Swergold was aware that Dr. Mueller and Dr. D'Eustachio, while having some evidence to undercut the government's evidence, could not eliminate the appellant as the source of the DNA material from SR's panties, trial defense counsel determined not to use Dr. Mueller and Dr. D'Eustachio and determined to focus on challenging the shortcomings in the government's DNA evidence. *See Affidavit of Trial Defense Counsel* of 30 June 2000, filed on 17 July 2000.

Before proceeding, a discussion of trial defense counsel's affidavit is appropriate. *United States v. Ginn*, 47 M.J. 236, 244 (1997), established that, unless the record on appeal "conclusively show[s] that [an appellant] is entitled to no relief," a *DuBay* hearing must be conducted to develop and to determine factual issues. At the same time, the Court of Appeals for the Armed Forces has determined that affidavits may be used in evaluating appellate claims of ineffective assistance of counsel. *United States v. Grigoruk*, 52 M.J. 312, 315–16 (2000) ("[The Army Court of Criminal Appeals] will request an affidavit from defense counsel explaining why Dr. Underwager or any other expert in child psychology was not called ... [t]he court will obtain additional evidence if necessary, conduct further fact finding in a manner consistent with *United States v. Ginn*, 47 M.J. 236 (1997), and reconsider appellant's claim of ineffective representation.") We conclude that we can consider trial defense counsel's affidavit in the following regard. The appellant complains that his trial defense counsel did not call Dr. Mueller or Dr. D'Eustachio on the merits during the defense case. We accept that fact as it is evident from the record. Trial defense counsel has stated that, once it was clear that Dr.

Mueller and Dr. D'Eustachio could not eliminate the appellant as the source of the DNA found on SR's panties (only reduce the probability), he pursued a different strategy regarding the DNA evidence. We accept that fact as well. Further, the two facts are not inconsistent with one another. In fact, they are in harmony.

The questions of which witnesses to call is a matter well within the province of trial defense counsel after consultation with the accused.

"It is important for counsel to evaluate all of the evidence and determine the strategy that is most likely to be successful." Prior to trial, counsel should decide, as a tactical matter, whether to call witnesses "because of their potential for impeachment and corroboration of the prosecution's case."

*United States v. Russell,* 48 M.J. 139, 140 (1998), quoting *United States v. Fluellen,* 40 M.J. 96, 98 (1994). The Court of Appeals for the Armed Forces has said that it "will not second-guess the strategic or tactical decisions made at trial by defense counsel." *United States v. Morgan,* 37 M.J. 407, 410 (1993). Neither will we. Dr. Mueller and Dr. D'Eustachio did have negative things to say about the ACIL which might have served to undercut the testimony of Mr. McCaffrey. However, for example, Dr. Mueller had negative things to say about the FBI lab as well as most other labs which did not measure up to his standards. Indeed, he had positive comments about few others in the field, one being a researcher at the University of Chicago. Similarly, Dr. D'Eustachio had little to say of a positive nature about many laboratories doing DNA work with the exception of the Bureau of Criminal Apprehension, the state police laboratory in Minneapolis. In the face of this, it was likely that the court members would find that Dr. Mueller and Dr. D'Eustachio were too extreme in their views and discount their testimony. In addition, while calling the conclusions of the ACIL into question, Dr. Mueller and Dr. D'Eustachio could not exclude the appellant as the source of the DNA on SR's panties. Dr. Mueller and Dr. D'Eustachio could only diminish the statistical probability of the appellant's having been the source or hypothe-

size laboratory accidents as the reason for the consistency between the DNA from the appellant's blood sample and the DNA from the semen found on the panties. Faced, on the one hand, with the prospect of undercutting the testimony of Mr. McCaffrey and, on the other hand, with the knowledge that Dr. Mueller and Dr. D'Eustachio would testify that there was a consistency between the appellant's DNA and the DNA in the semen on the panties, the trial defense counsel cannot be found ineffective for determining not to call Dr. Mueller or Dr. D'Eustachio on the merits during the defense case. Thus, we conclude that LT Swergold's performance was not deficient. The appellant has not shown the first part of the *Strickland* test.

However, even if we had found a serious deficiency in LT Swergold's decision, was the appellant prejudiced? If Dr. Mueller and Dr. D'Eustachio had testified, their testimony would have revealed two things. If Dr. Mueller and Dr. D'Eustachio were believed, the finder of fact could have found the credibility of Mr. McCaffrey diminished. Yet, even Dr. Mueller and Dr. D'Eustachio could not say that the appellant was excluded as the source of the DNA. Thus, Dr. Mueller and Dr. D'Eustachio would have been additional witnesses that, at some level of probability, the appellant's DNA was consistent with that found on SR's panties.

Beyond that, even if the finder of fact had found Mr. McCaffrey totally unworthy of belief, the finder of fact would still have been left with the fact that semen was found on SR's panties and that SR identified the appellant as her assailant.

We conclude that trial defense counsel was effective, that trial defense counsel made a reasonable strategic and tactical decision, and that the appellant was not prejudiced by trial defense counsel's not calling Dr. Mueller or Dr. D'Eustachio during the merits of the defense case.

#### b. Other Ineffectiveness Claims

The appellant has also asserted ineffectiveness of his trial defense counsel in a number of other respects. He argues that his trial defense counsel was ineffective in failing to file his request for speedy trial in a timely fashion. Since we have already concluded

that the appellant was not denied a speedy trial (which decision was not based on when the request for speedy trial was made), we do not find that trial defense counsel was ineffective in not filing the request earlier.

The appellant also asserts that the trial defense counsel was ineffective in failing to obtain a videotape of the gate at Naval Station, Mayport. The events involving SR were alleged to have occurred on 28 September 1995. Defense counsel was first appointed to the appellant on 3 October 1995, and charges were preferred on 13 October 1995. There was testimony that the videotapes at the gates are recycled after thirty days (in this case, on or about 28 October 1995). Significantly, the appellant does not inform us what these tapes would show that would be beneficial to his case. The appellant has not demonstrated that trial defense counsel was deficient, let alone that he was prejudiced by not having these videotapes.

The appellant next asserts that trial defense counsel was ineffective in failing to prepare the appellant to testify. The appellant argues that he was "compelled to remain silent" because his trial defense counsel failed to prepare the appellant to testify. Of course, the decision whether to testify belongs exclusively to the accused after consultation with counsel. *Standards for Criminal Justice* § 4–5.2 (2d edition 1980); *United States v. Jones,* 14 M.J. 700, 702 (N.M.C.M.R.1982). On three separate occasions, the military judge questioned the appellant about his understanding of his right to testify (or not to testify) or about the choice he had made, or both. The military judge verified that the appellant understood that he, and he alone, determined whether to testify or not. Record at 323. The military judge again discussed this right at length with the appellant. Record at 2530–34. In fact, the appellant himself stated, "I feel that I will be very confident in making that decision with counsel that I have now." Record at 2532. Yet again, the military judge discussed with the appellant his absolute right to testify or not to testify, and his decision not to testify. The appellant acknowledged that it was his own free and voluntary decision and that he believed it to be in his best

interests. Record at 2707–08. With such a record of the accused's knowledge of his rights, his exercise of those rights, and the absence of any intimation to the trial judge that the decision was not free and voluntary, the appellant has not demonstrated that trial defense counsel was deficient, let alone that he was prejudiced by not being prepared to testify when the appellant did not desire to testify.

The appellant asserts that trial defense counsel was ineffective because counsel tried to browbeat him into accepting a pretrial agreement and pleading guilty. Similar to the situation involving the right to testify, the military judge discussed with the appellant his right to plead guilty or to plead not guilty, to enter into a pretrial agreement or not to do so. Record at 324. In fact, in this case, the appellant did not plead guilty. Therefore, while there is no evidence that attempts were made to coerce the appellant to plead guilty, since he did not plead guilty it is difficult to understand how he was prejudiced. The appellant has not demonstrated that trial defense counsel attempted to coerce the appellant to plead guilty, let alone that he was prejudiced by any action of counsel.

We have examined the appellant's other claims of ineffective assistance of counsel, and we have concluded that they are, likewise, without merit.

### IV. Testimony of Mr. McCaffrey

In the context of the DNA evidence in this case, there was a dispute about the use of "The Product Rule" or the "Modified Ceiling Principle" in determining the statistical probability that someone other than the appellant was the source of the DNA found on SR's panties. Record at 592–614. The Product Rule in this case yielded frequency rates as high as one in 186,739,594. Appellate Exhibit XLIV. The Modified Ceiling Principle yielded a frequency rate of one in 1,051,090 or one in 975,953. Prosecution Exhibit 29. This was characterized at trial as "one out of a million." Record at 2295. After having considered all of the evidence, the trial judge ruled, "[T]herefore it is this court's ruling that although relevant and having support within a portion of the scientific community,

the Product Rule calculations will not be admitted. Calculations under the Modified Ceiling Technique, the actual Counting Method, and the Full Ceiling Technique, with or without error rates, will be permitted to be introduced by both sides." Record at 684.

During the course of the trial, Prosecution Exhibit 29, Mr. McCaffery's calculations using the Modified Ceiling Technique, were admitted into evidence. At the time of publication of the exhibit to the members, the trial judge instructed the members:

Members, I want to make it very clear that in dealing with these population statistics you are not to consider these statistics as anything akin to the percentage of guilt or innocence. That is not the purpose. The population statistics are utilized to determine if—what the probabilities of any individual in the population having this particular—the band in these particular locations.

Is that clear to the members? The burden of proof, the presumption of innocence applies throughout the trial. There is no shifting of the burden to the defense in any manner because you have these statistical probabilities of guilt or probability of innocence applied in any mathematical formula in any fashion.

. . .

Also the word "conservative" and "extremely conservative" have been utilized in the presentation of the evidence. You are not permitted to consider any other probabilities of a random match in the general population or the populations referred to by the expert greater than—any greater probabilities than those which you will have received into evidence.

All of the members indicated that they would follow this instruction. Record at 2294.

During redirect examination of Mr. McCaffery, the following exchange occurred:

[TC]: All right, so when you give us the figure of roughly one in a million, is that the one in a million people would have DNA indistinguishable from the sample?

[McCaffery]: That is the number that was calculated based on using the ceiling principle, and it is based on all those conserva-

tisms that are put in there. The number, in my opinion, is much larger—much larger than that.

[TC]: All right, what are—

ADC: Your Honor.

MJ: Members, you will disregard the last answer in accordance with the instruction I just gave you.

Record at 2381.

Defense counsel moved for a mistrial. The motion for a mistrial was denied. Defense counsel moved to strike Mr. McCaffery's testimony. This was denied as well. Record at 2382–83. When the members returned to the courtroom, the trial judge instructed them, "let me advise you, you must disregard the last answer, the opinion of this witness. His last answer was not proper; it is not to be treated or considered as evidence. You will not speculate about it. Can all the members follow that?" All the members indicated that they could do so. Record at 2391.

 It is well settled that a mistrial is a drastic remedy reserved for those occasions when necessary to prevent a miscarriage of justice. *United States v. Taylor,* 53 M.J. 195, 198 (2000). Further, the court members are presumed to follow the military judge's instructions. *United States v. Holt,* 33 M.J. 400, 408 (C.M.A.1991). We conclude that the military judge adequately addressed the response of Mr. McCaffery by directing the members' attention to the prior instruction on the use of the statistical information and by instructing them to disregard Mr. McCaffery's response.

## V. *Gorski* Claim

Appellant argues that the automatic forfeiture provisions of Article 58b, Uniform Code of Military Justice, should not apply in his case because, to do so, would result in an *ex post facto* application of a penal statute. In *United States v. Gorski,* 47 M.J. 370 (1997), the Court of Appeals for the Armed Forces held that application of Article 58b, UCMJ, to the offenses which predate the effective date of the statute, 1 April 1996, would amount to an *ex post facto* application of the penal statute. All of the offenses in this case occurred prior to 1 April 1996. Therefore,

we will direct that any forfeitures which the accused has suffered as a result of Article 58b, UCMJ, be restored.

## VI. Other Claims

We have carefully considered all of the appellant's other assignments of error, and we find no error materially prejudicial to a substantial right of the appellant and find those assignments to be without merit.[3]

## Conclusion

Accordingly, we have concluded that the findings and sentence are correct in law and in fact and that no error materially prejudicial to a substantial right of the appellant was committed. The findings and sentence, as approved on review below, are affirmed. However, we direct that any forfeitures which may have been collected from the appellant pursuant to Article 58b, UCMJ, be restored to the appellant.

Judge ANDERSON and Judge PRICE concur.

---

3. In considering the appellant's assignment of errors, we have taken the following actions with respect to motions not previously decided by the court. The appellant's Motion to Attach brig information is granted. The appellant's Motion to Attach Documents relating to problems with his car is denied. The appellant's Motion to Attach his affidavit regarding ineffective assistance of counsel is granted. And, the appellant's Motion for Retesting and to Attach is granted as to attaching the documents, but is denied as to the retesting.