# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

———————————

**No. 201500297**

———————————

## UNITED STATES OF AMERICA
Appellee

v.

## JEFFREY J. QUICHOCHO
Petty Officer First Class (E-6), U.S. Navy
Appellant

———————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Major Michael Libretto, USMC.
For Appellant: Lieutenant R. Andrew Austria, JAGC, USN.
For Appellee: Lieutenant Taurean K. Brown, JAGC, USN;
Lieutenant James M. Belforti, JAGC, USN.

———————————

Decided 29 November 2016

———————————

Before PALMER, MARKS, and HUTCHISON, *Appellate Military Judges*

———————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

———————————

PALMER, Chief Judge:

At a general court-martial, a military judge convicted the appellant, pursuant to his pleas, of seven specifications of violating a general order by wrongfully engaging in sexual harassment and two specifications of assault consummated by a battery in violation of Articles 92 and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892 and 928 (2012). The military judge convicted the appellant, contrary to his plea, of one specification of sexual assault in violation of Article 120, UCMJ, 10 U.S.C. § 920. The convening authority approved the adjudged sentence of four years' confinement, reduction to pay-grade E-1, and a dishonorable discharge.

The appellant raises three assignments of error:[1] (1) that the evidence was factually insufficient to sustain the appellant's conviction for sexual assault; (2) that the appellant's trial defense counsel (TDC) were ineffective; and (3) that the military judge improperly admitted evidence of other charged sexual misconduct.[2] After considering the alleged errors, we are satisfied that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant occurred. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

Between May 2013 and August 2014, the appellant variously sexually harassed seven subordinate female Sailors on divers occasions by making repeated and unwelcome comments, gestures (to include exposing his penis and scrotum), and contact of a sexual nature in the workplace at Naval Air Station (NAS) Whidbey Island and Sheikh Isa Air Base, Bahrain. Between January 2014 and August 2014, the appellant caused bodily harm to a subordinate, female Sailor by rubbing her breast, over her clothes, with his shoulder. And, between June 2013 and December 2013, the appellant caused bodily harm to a subordinate, female Sailor by grabbing her buttocks, over her clothes, with his hands.[3]

On 16 May 2014, the appellant, a married 38-year-old petty officer first class; the victim, Petty Officer Second Class (PO2) CW; and several other Sailors traveled on official temporary duty orders to San Diego as part of a squadron detachment. After concluding the day's travel, unloading aircraft cargo, and setting up their work stations, the group purchased snacks and alcohol and then checked into their on-base hotel. The appellant and PO2 CW were, by happenstance, billeted in immediately adjacent rooms on the second deck. They had been assigned to the same unit since August 2013 and had previously socialized in group settings with co-workers, but were not romantically involved. At approximately 1700, during an unplanned encounter while both were smoking outside their rooms, they discussed getting together for drinks. The appellant offered PO2 CW a beer, which they retrieved from his room, but she only drank a small amount. At approximately 1730, both went to PO2 CW's room, where they snacked on

[1] We have reordered the assignments of error raised in the appellant's brief.

[2] Raised as a summary assignment of error pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[3] The appellant's sexual harassment and assault offenses were fully supported by his statements made during the providence inquiry and the stipulation of fact. Prosecution Exhibit (PE) 1.

chips and salsa and she drank vodka mixed with juice. The appellant told PO2 CW he had an "open marriage" in which his wife allowed him to have extra-marital affairs. In response, PO2 CW told him she "would never do anything with [him]."[4] At approximately 2000, PO2 CW told the appellant to leave her room because she had a computer video-chat "Skype-date" with another friend.

After the date, which lasted about an hour, PO2 CW invited the appellant back to her room. At some point, the appellant offered to take PO2 CW shopping for underwear at Victoria's Secret on the condition that he could see her wearing the undergarments. PO2 CW declined, telling the appellant, "no, I don't need any help shopping for my underwear, and that would be weird."[5] After PO2 CW mentioned that her back hurt as a result of unloading cargo, the appellant stated he was a professional masseur and offered to give her a back massage at some future time. He explained that on a previous deployment he had given a massage to a woman who then fell asleep and that he left without disturbing her.

The appellant then tried to convince PO2 CW to take suggestive photographs of herself and offered to take the photographs. She declined but did not otherwise object to the discussion topic. At approximately midnight, she told the appellant she was tired, and he departed. PO2 CW changed into her pajamas, which consisted of yoga pants, a sports bra, and a T-shirt. She then spoke with a friend on the telephone until approximately 0130. Upon hanging up she noticed the appellant had sent her three text messages and a Facebook message offering to give her a massage that would be "strictly pro[fessional]."[6] PO2 CW told the appellant she was "about 5 minutes away from passing out" but accepted the offer.[7] At this point, PO2 CW had consumed four drinks over the course of the evening. She described herself as being buzzed and "not sober."

The appellant returned and began to massage PO2 CW's back as she lay face down on the living room couch. Realizing her sports bra was in the way, and having experienced professional massages in the past, PO2 CW removed her bra while keeping her shirt on and without exposing her breasts. After several minutes, the appellant suggested moving to the bed in order to massage both sides of her back. PO2 CW agreed, and they moved to the bedroom where the appellant continued to massage her back using lotion.

---

[4] Record at 129.

[5] *Id.* at 132.

[6] PE 3 at 1.

[7] Record at 141.

3

After several minutes the appellant said he needed to sit on her buttocks to give a proper massage, and PO2 CW agreed. PO2 CW remembers the appellant asking her if she ever had a "butt massage," to which she "hazily replied no," and then she fell asleep.[8]

Several minutes later PO2 CW groggily awoke to find herself lying naked on her back and the appellant digitally penetrating her vagina with his fingers and stimulating her with his other hand. Although she told the appellant to stop, he continued while shushing her. She then said, "no stop" and the appellant slowly removed his fingers, covered her chest and waist area with towels, and then, still fully dressed, walked out of the room.[9]

PO2 CW did not immediately report the assault, stating she did not want to draw attention to herself or risk being pulled from the Coronado detachment. Several months later, however, she reported it—first to her unit Sexual Assault Response Coordinator and then, on 21 August 2014, to the Naval Criminal Investigative Service.

## II. DISCUSSION

### A. Factual sufficiency

The appellant argues the evidence supporting his conviction was factually insufficient[10] because 1) PO2 CW's testimony strongly indicates the sexual acts were consensual, and 2) PO2 CW had a strong motive to fabricate her sexual assault allegation. We disagree.

We review questions of factual sufficiency *de novo. United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at

---

[8] *Id.* at 145.

[9] *Id.* at 147-48, 191-92.

[10] Although the appellant styles this assignment of error as one based on factual and legal sufficiency, he does not analyze or challenge legal sufficiency in the body of his pleadings. The government, therefore, believed the appellant conceded legal sufficiency. Answer on Behalf of the Appellee of 13 May 2016 at 26 n. 5. The appellant did not contest this assertion in his Reply Brief. Accordingly, we find that legal sufficiency is not adequately raised and thus do not address it.

399. Proof beyond a reasonable doubt does not mean, however, that the evidence must be free from conflict. *United States v. Goode*, 54 M.J. 836, 841 (N-M. Ct. Crim. App. 2001).

A conviction for this sexual assault offense requires proof beyond a reasonable doubt of two elements: (1) that the appellant committed a sexual act upon PO2 CW by digitally penetrating her vagina, and (2) that the appellant knew or reasonably should have known that PO2 CW was asleep.[11]

The appellant argues the sexual acts were consensual or that he had a reasonable mistake of fact as to consent. He points to the overall circumstances, in which PO2 CW invited him to her dimly lit hotel room and consented to the late night massage while she lay face down on her bed. He further argues the implausibility of PO2 CW not waking up as he rolled her on her back, removed all her clothes, and inserted his fingers in her vagina. Finally, he argues that his compliance, after she twice told him to stop, indicated her initial consent or his belief in her consent.

Additionally, the appellant asserts PO2 CW did not report the assault until after the appellant's wife confronted her about the infidelity. Realizing he did not have "an open marriage" as he had led her to believe, the appellant claims PO2 CW was afraid of getting in the middle of his marital discord, was worried that his wife was angry, and was concerned about negative impacts on her career.[12] The appellant argues that these motives, combined with PO2 CW's potentially exaggerated claims of her parasomnia history (*see* Section II B, *infra*), should cause reasonable doubt as to the veracity of PO2 CW's testimony.

Our assessment of the evidence leaves us convinced beyond a reasonable doubt of the appellant's guilt.

First, PO2 CW's testimony was direct and unequivocal. She testified that she was asleep during the assault and did not consent to the appellant's actions. Her stated trust in the appellant was based largely on his assurances that he was a professional masseur who would not take advantage of a sleeping woman. PO2 CW told the appellant she was exhausted and with good reason: she had been awake since 0500 the previous day, spent most of

---

[11] MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶ 45(b)(2). Although originally charged as the appellant penetrating PO2 CW's vagina and rectum while she was asleep or unconscious, before announcing findings the military judge dismissed the words "and rectum" and excepted the words "or unconscious."

[12] Appellant's Brief and Assignment of Error of 12 Feb 2016 at 23-24; Record at 200.

the day working, and had consumed a significant amount of alcohol. She explained she was a very sound sleeper who often slept through her alarm and other loud noises.[13]

Second, PO2 CW's testimony was corroborated, in part, by PO2 JMW, who was assigned to the same detachment. PO2 JMW testified that the appellant claimed, during a conversation between the two of them, that he had sex with PO2 CW. Later, during August 2014, the appellant phoned PO2 JMW and, sounding panicked, said there was going to be an investigation, and that he did not have sex with PO2 CW, but that "he was giving her a massage and his hand slipped."[14] PO2 CW's testimony was further corroborated by PO3 AF, a friend of both PO2 CW and the appellant. PO3 AF testified that during August or September 2014, the appellant asked her to tell PO2 CW that he "apologize[d] for anything that might have happened."[15] Under the circumstances of this case, we find the appellant's apology evidences a consciousness of guilt. *See United States v. Reeves*, No. 33946, unpublished op., 2001 CCA LEXIS 226, at *17 (A.F. Ct. Crim. App. 9 Aug 2001). Further, the appellant asked PO3 AF to instruct PO2 CW to tell his wife that "he had flipped [PO2 CW] over, and his fingers slipped inside[.]"[16] We find the appellant's statement implies—consistent with PO2 CW's testimony—that she did not turn herself over. And we find it unlikely that his fingers could inadvertently slip into her vagina.

Third, pursuant to MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 413, SUPPLEMENT TO MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) the military judge properly considered evidence of other instances of the appellant's sexual contact against subordinate, female Sailors within the appellant's command (*see* Section II C, *infra*).

Finally, PO2 CW's testimony was credible. The appellant's concern that she reported the sexual assault because she had been contacted by the appellant's wife overlooks the fact that PO2 CW was thinking about reporting *before* the appellant's wife called and texted her.[17] Moreover, although PO2 CW testified that she was worried about the appellant's wife and did not want to get in the middle of their marriage, the wife's phone message was not

---

[13] *Id.* at 184.

[14] *Id.* at 211-13, 216.

[15] *Id.* at 226 and 228-29.

[16] *Id.* at 230.

[17] *Id.* at 206 and PE 4 at 1. PE 4 is PO2 CW's phone-call history showing a telephone call from the NAS Whidbey Island Sexual Response Coordinator occurring two days before the appellant's wife called her.

threatening or hostile, and thus, in our view, was unlikely to prompt PO2 CW to make false allegations against the appellant.[18]

After weighing all the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt of the appellant's guilt.

**B. Ineffective assistance of counsel**

During the weekend prior to the appellant's Monday court-martial, the TDC and assistant TDC were provided their first opportunity to interview PO2 CW. During this interview, conducted in the presence of PO2 CW's victim legal counsel (VLC), PO2 CW stated that she experienced a one-time episode of sleepwalking during the fall of 2009 while attending college. She stated she thought she had overslept and missed an exam only to discover that she had actually taken and passed it.

The appellant argues his TDC were ineffective for failing to consult a medical expert about PO2 CW's claim that she suffered from parasomnia, and that failure prejudiced his ability to undermine PO2 CW's credibility and assert a mistake-of-fact as to consent defense. We disagree.

We review claims of ineffective assistance of counsel *de novo. United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015). The appellant must clear "a high bar" to prevail on such a claim. *Id.* at 371. He must show: (1) that his counsel's performance was deficient, and (2) that, but for his counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)).

The first prong requires the appellant to show that counsel's performance fell below an objective standard of reasonableness, indicating that counsel was not functioning within the meaning of the Sixth Amendment. *United States v. Terlep*, 57 M.J. 344, 349 (C.A.A.F. 2002). Our review of counsel's performance is highly deferential and is buttressed by a strong presumption that counsel provided adequate representation. *United States v. Garcia*, 59 M.J. 447, 450 (C.A.A.F. 2004). The second prong requires a showing of prejudice resulting from counsel's deficient performance. *Strickland*, 466 U.S. at 687. Such prejudice must be "so serious as to deprive [the appellant] of a fair trial," producing "a trial whose result is unreliable." *United States v.*

---

[18] *Id.* at 199. PO2 CW described the phone message as saying that the appellant's wife would appreciate hearing from her, that she was not blaming PO2 CW for anything, and that she "actually wanted to say thank you [to PO2 CW] for being the better person."

*Dewrell*, 55 M.J. 131, 133 (C.A.A.F. 2001) (citation and internal quotation marks omitted). The appropriate test for this prejudice is "whether there is a reasonable probability that, but for counsel's error, there would have been a different result." *United States v. Quick*, 59 M.J. 383, 386-87 (C.A.A.F. 2004) (citation omitted).

We find the appellant has not met his burden of demonstrating that his two TDC were ineffective.

The appellant's assistant TDC, who conducted PO2 CW's pretrial interview and cross-examined her at trial, explained via a court-ordered affidavit that PO2 CW told her she had a parasomnia event when she passed a college exam while sleepwalking and that she talks in her sleep. The assistant TDC discussed the issue with the TDC,[19] and they decided that this information did not alter the defense theory of the case—that the victim consented and then later fabricated her non-consent. In reaching this decision, the assistant TDC took into account that the sleep-walking incident occurred several years earlier; it was a one-time event; PO2 CW's friends and roommates never reported her sleep-walking; she had never been diagnosed with parasomnia; and her medical records contained no reference to sleepwalking.

Additionally, the assistant TDC explained that she learned during trial advocacy training on parasomnia that without a sleep study—to which she did not believe PO2 CW's VLC would consent—a parasomnia expert probably would not be able to conclude PO2 CW was even prone to such episodes. She was also aware that in cases in which parasomnia was raised as a viable defense, a robust sleep walking history, supported by objective witnesses, was required—evidence which did not exist in the appellant's case.

Lastly, the assistant TDC recognized a need to quickly litigate the case. There were seven other victims of offenses to which the appellant was pleading guilty, and thereby securing a pretrial agreement's protections. By the date of trial the government only had a few victim impact statements, and even those were "not as powerful as they could have been had the VLC's [sic] or trial counsel been given more time . . . [the lead TDC] and I firmly believed that [had they sought a continuance] more time would only have inured to the benefit of the government . . . ."[20]

---

[19] Although the TDC does not recall discussing sleep-walking with the assistant TDC, he does believe they talked about the victim's statements. TDC Affidavit of 29 Mar 2016 at 5.

[20] Assistant TDC Affidavit at 6. Other than disagreements over the efficacy of an expert's ability to assist the defense, there are no significant relevant factual disputes between the appellant's pleadings and the two TDCs' affidavits.

For these reasons, the TDC and assistant TDC opted against seeking a continuance in order to obtain expert assistance or an expert witness. Instead, they cross-examined the victim about sleepwalking and then relied upon that history to argue consent and mistake-of-fact as to consent.

In assessing the claim of ineffective assistance, "[w]e do not look at the success of a trial theory or tactical decision, but whether counsel made an objectively reasonable choice in strategy from the alternatives available at the time." *United States v. Williams*, No. 200202264, 2005 CCA LEXIS 320, at *3, unpublished op. (N-M. Ct. Crim. App. 19 Oct 2005) (citing *Dewrell*, 55 M.J. at 136). Here, we find the decision to forego a continuance and the potential for expert assistance was an objectively reasonable strategic choice. The trial defense team consciously balanced the potential benefits of pursuing a tenuous parasomnia-consent defense versus seeking the best possible sentence for their client. That tactical decision to focus on minimizing the appellant's risk at sentencing was ostensibly validated when the military judge imposed two less years' confinement than the pretrial agreement's confinement cap. Given our deferential review of counsel's performance and strong presumption of adequate representation, we are unable to conclude that the trial defense team's representation "fell below an objective standard of reasonableness." *Akbar*, 74 M.J. at 386 (citations and internal quotation marks omitted). *See also Garcia,* 59 M.J. at 450.

Even if we assumed the TDC and assistant TDC's performance was deficient, we are not convinced "there is a reasonable probability that, but for counsel's error, there would have been a different result." *Quick*, 59 M.J. at 386-87 (citation omitted). Here the fact-finder, a military judge, heard the victim's description of her single-episode sleepwalking history and was thus able to give it the weight he deemed appropriate—along with considerations of the victim's overall testimony, the appellant's attempted apology, and the admission that he "flipped her over [and] his fingers slipped inside[.]"[21] We are unpersuaded that a different verdict would have possibly resulted with a defense expert consultant or witness.

C. **Admission of evidence of similar crimes**

At trial, the appellant stipulated and pleaded guilty to sexually harassing and assaulting several subordinate, female Sailors. His pretrial agreement preserved his right to challenge the admissibility of that misconduct under MIL. R. EVID. 404(b) and 413. Exercising that right, he filed a timely motion to oppose the admission of the offenses to which he had pleaded guilty as

---

Accordingly, we find no requirement for additional fact-finding on this issue. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997).

[21] Record at 230.

similar crimes propensity evidence, arguing they were "not factually or legally related to the proffered government evidence"[22] of the contested specification. The appellant now argues the military judge erred in finding the probative value of the evidence outweighed the danger of unfair prejudice. We disagree.

We review "a military judge's decision to admit evidence for an abuse of discretion." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citing *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010)). "'The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010)).

MIL. R. EVID. 413(a) provides, "[i]n a court-martial proceeding for a sexual offense, the military judge may admit evidence that the accused committed any other sexual offense. This evidence may be considered on any matter to which it is relevant." Thus, "inherent in [MIL. R. EVID.] 413 is a general presumption in favor of admission." *United States v. Berry*, 61 M.J. 91, 95 (C.A.A.F. 2005) (citation omitted).

The "three threshold requirements" for admitting evidence of similar offenses in sexual assault cases under MIL. R. EVID. 413 include: (1) the accused must be charged with an offense of sexual assault; (2) the proffered evidence must be evidence of the accused's commission of another offense of sexual assault; and (3) the evidence must be relevant under MIL. R. EVID. 401 and 402. *United States v. Bass*, 74 M.J. 806, 815 (N-M. Ct. Crim. App. 2015) (citing *United States v. Wright*, 53 M.J. 476, 482 (C.A.A.F. 2000)). In order to meet the second requirement, the military judge must conclude that the members "could find by [a] preponderance of the evidence that the offenses occurred." *Wright*, 53 M.J. at 483 (citing *Huddleston v. United States*, 485 U.S. 681, 689-90 (1988)).

Once the threshold requirements are met, "the military judge is constitutionally required to also apply a balancing test under [MIL. R. EVID.] 403." *Solomon*, 72 M.J. at 179-80 (citing *Berry*, 61 M.J. at 95). In conducting the MIL. R. EVID. 403 balancing test, "the military judge should consider the following non-exhaustive factors . . .":

> strength of proof of the prior act (i.e., conviction versus gossip); probative weight of the evidence; potential for less prejudicial evidence; distraction of the factfinder; time needed for proof of

---

[22] Appellate Exhibit V at 1.

the prior conduct; temporal proximity; frequency of the acts; presence or lack of intervening circumstances; and the relationship between the parties.

*Id.* at 180 (citation omitted). "When a military judge articulates his properly conducted [MIL. R. EVID.] 403 balancing test on the record, the decision will not be overturned absent a clear abuse of discretion." *Id.* (citing *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000)).

In this case, the first threshold requirement for admitting evidence of similar offenses under MIL. R. EVID. 413 is not disputed. Specification 1 of Charge II alleged the appellant committed a sexual assault offense. Regarding the second threshold requirement, the military judge carefully parsed the stipulation of fact and found sufficient evidence to meet the required preponderance standard that the offenses occurred. In particular, he found that the appellant committed sexual contact, as defined in Article 120, UCMJ, when he variously touched the breasts, buttocks, or thigh of six subordinate Sailors.[23] The appellant stipulated that each contact with each victim was "unwelcomed . . . physical contact [that was] sexual in nature."[24]

Regarding the third threshold requirement, the military judge correctly concluded that MIL. R. EVID. 413 permitted the use of adjudicated sexual assault offenses to prove propensity to commit like crimes, and thus found the evidence of similar crimes to be relevant under MIL. R. EVID. 401 and 402. *See United States v. Hills*, 75 M.J. 350, 354 (C.A.A.F. 2016) (confirming that "an offense to which an accused has pleaded guilty or been found guilty can be admitted and considered under [MIL. R. EVID.] 413 to show propensity to commit the sexual assaults to which he pleaded not guilty"). He further found the evidence potentially relevant to show lack of mistake and intent.

Having satisfied the threshold requirements, the military judge conducted the required balancing test under MIL. R. EVID. 403 to determine whether the probative value of the evidence was outweighed by the risk of unfair prejudice to the appellant. Addressing the non-exhaustive *Solomon* factors, the military judge found:

(1) Given that the proof of the prior acts was based on a stipulation of fact agreed to by both parties, the evidence was very strong;

---

[23] Sexual contact is defined as "(A) touching, or causing another person to touch, either directly or through the clothing, the genitalia, anus, groin, breast, inner thigh, or buttocks of any person, with an intent to abuse, humiliate, or degrade any person; or (B) any touching, or causing another person to touch, either directly or through the clothing, any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person." MCM, Part IV. ¶45(g)(2).

[24] PE 1 at 2-6.

11

(2) Although noting the more serious nature of the contested charge, the military judge considered the similarities between the sexual contact of several other female subordinates and that involving PO2 CW. Specifically, he found they all involved nonconsensual sexual contacts against junior, female Sailors the appellant knew from work, and which occurred either in the workplace or while deployed or on temporary duty. As such, he found the probative weight of the evidence to be high;

(3) The form of the evidence—a stipulation of fact—reduced any prejudicial impact and also significantly minimized fact finder distraction;[25]

(4) Considering the frequent nature of the other offenses and that they all occurred in the same 15-month period as the contested sexual assault charge, the military judge found there were no intervening circumstances that tended to minimize the probative value of the evidence; and

(5) Noting the relationship between the parties, the military judge found them to be very similar, in that all were junior Sailors with whom the appellant worked.

After balancing these factors, the military judge concluded that "the similarities are such that the probative value of the propensity evidence is not substantially outweighed by the danger of unfair prejudice."[26]

We agree. The military judge carefully considered all the *Solomon* factors and, in so doing, found each factor militated in favor of admission. Further, the military judge made clear that he would only consider the evidence of sexual offenses, specifically instances of actual sexual contact, and that he would not consider for any purpose the verbal comments and gestures that were part of many of the stipulated sexual harassment offenses. Accordingly, we easily conclude the military judge did not abuse his discretion when admitting the specific propensity evidence identified in his ruling.

### III. CONCLUSION

The findings and the sentence as approved by the convening authority are affirmed.

Senior Judge MARKS and Judge HUTCHISON concur.

For the Court

R.H. TROIDL
Clerk of Court



---

[25] Because the military judge was the finder of fact, we are further convinced the admitted propensity evidence was not a distraction.

[26] Record at 34.