# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––––

**No. ACM 39325**

––––––––––––––––

**UNITED STATES**
*Appellee*

**v.**

**Jesse L. BRAZELL**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

––––––––––––––––

Appeal from the United States Air Force Trial Judiciary

Decided 29 January 2019

––––––––––––––––

*Military Judge:* Natalie D. Richardson.

*Approved sentence:* Dishonorable discharge, confinement for 7 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 26 May 2017 by GCM convened at Eglin Air Force Base, Florida.

*For Appellant:* Major Todd M. Swensen, USAF; Robert A. Feldmeier, Esquire; Frank J. Spinner, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Thomas C. Franzinger, USAF; Captain Michael T. Bunnell, USAF; Mary Ellen Payne, Esquire.

Before HUYGEN, MINK, and POSCH, *Appellate Military Judges.*

Judge POSCH delivered the opinion of the court, in which Senior Judge HUYGEN and Judge MINK joined.

––––––––––––––––

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

––––––––––––––––

POSCH, Judge:

A general court-martial composed of officer and enlisted members found Appellant guilty, contrary to his pleas, of two specifications of sexual assault of a child and one specification of sexual abuse of a child, in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b. The three offenses involved Appellant's conduct in Okinawa, Japan, with ML, a 12-year-old girl, during one evening in July 2016 when Appellant penetrated ML's mouth with his tongue and her vulva with his finger, and touched her breasts and buttocks with his hands.[1] Appellant was sentenced to a dishonorable discharge, confinement for seven years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

Appellant raises three issues on appeal:[2] (1) whether the evidence is legally and factually sufficient to support the convictions; (2) whether the military judge committed plain error when she allowed ML's father to testify that Appellant stated he "wanted to have sex with anything he could or f**k anything with a hole in it" while visiting Japan;[3] and (3) whether the military judge committed plain error by instructing the panel members in a way that discouraged them from questioning witnesses and replaying testimony. Finding no error, we affirm the findings and sentence.

## I. BACKGROUND

The Government's case rested primarily on testimony given by ML and her family members, including her father, JL, her stepmother, KL, and her younger brother.

Appellant and then-Technical Sergeant JL met in early 2010 when Appellant, an 18-year-old Airman and maintenance apprentice, was assigned to

---

[1] Appellant was acquitted of Specification 1 of the Charge, which alleged Appellant sexually abused ML by causing ML to touch his genitalia through his clothing. This offense allegedly happened several years earlier when Appellant lived with ML's family in Mississippi.

[2] After filing assignments of error, Appellant petitioned for extraordinary relief in the nature of a writ of habeas corpus, claiming his court-martial lacked subject-matter jurisdiction because of the provisions of the Status of Forces Agreement between the United States and Japan. We denied the petition by order of this court.

[3] Appellant's assignment of error claims the military judge committed plain error when she allowed ML's father to testify about Appellant's "bad general character," but Appellant's brief discusses only this specific statement.

JL's squadron at Keesler Air Force Base, Mississippi. JL was a friend and mentor to Appellant, and Appellant became a top performer earning recognition and promotion to the grade of senior airman (E-4) ahead of his peers. Because of his promotion, Appellant was eligible to move out of the on-base dormitory and in 2013 moved in with JL and KL. Appellant often spent time with ML and her brother, who lived nearby with their mother and regularly visited their father at his home. Appellant lived with JL's family in Mississippi for at least 15 months and developed a close relationship with JL's children, who referred to him as "Uncle Jesse."

In early 2015, JL moved with KL to Okinawa, Japan, and began work as a United States government contractor employee. ML and her brother relocated to Louisiana with their mother, and Appellant was reassigned to a new duty station. Despite these changes, JL still felt responsibility as Appellant's "big brother," and they remained close friends and spoke several times a week, if not daily. During one conversation, Appellant mentioned he wanted to visit Japan and spend time with JL and other friends living in Okinawa. JL saw this as an opportunity for his children to visit and offered to pay for Appellant's round-trip plane ticket if Appellant would escort his children on the trip. Appellant agreed and in July 2016 Appellant accompanied 12-year-old ML and her 11-year-old brother to visit their father and KL for two weeks.

When they arrived in Okinawa, the children stayed with JL and KL and Appellant stayed with other friends. Each morning, JL and Appellant worked out at the gym and talked about their lives and careers. JL testified to "hearing things [from Appellant] that were very concerning." Appellant explained to JL that his promotion to the grade of E-6 had been "red-lined"[4] after he was disciplined for operating a boat under the influence of alcohol. After Appellant opened up and disclosed events in his personal life and career, JL reached out to a mutual friend, passed on JL's concern about changes he saw in Appellant, and said that "we need to talk to [Appellant]" and "[w]e need to get him under reigns [sic]."

One morning toward the end of the trip, JL remarked that Appellant had not spent much time with his children and invited Appellant to accompany the family to a waterpark. Appellant went along and later joined them at a cookout at their home. JL and Appellant drank alcoholic beverages while they prepared food. JL testified he noticed the interaction between Appellant and KL and disliked the "way [Appellant] was looking at" his pregnant wife.

---

[4] "Red-line" means to remove a name from a promotion list.

Appellant had taken off his shirt after it had become soiled and JL did not like "the way [Appellant] was going about handling himself . . . without a shirt on."

Near the end of the evening, JL and Appellant got into what JL testified was a "heated discussion." JL told Appellant, "I don't like what you're doing here," and got close to Appellant's face and asked, "[W]hat's going on?" According to JL, Appellant stood up to JL "like [Appellant] was the man of the house," which Appellant had never done in all the years JL had known him. The two took a walk outside to "clear the air," and JL concluded it was best to just "back off and [defuse] the situation." KL and the children were sitting on the porch when they returned and KL suggested everybody should go to bed, including Appellant.

KL directed Appellant to sleep in an unoccupied spare bedroom, but Appellant instead went to the bedroom where the children were sleeping in a king-size bed. Appellant laid next to ML to her left as her brother laid to her right. With the lights off, Appellant put his right arm under ML's head and they played checkers on Appellant's phone. ML testified she turned to her right and away from Appellant to go to sleep, but Appellant pulled her by the waist against his erect penis. According to ML, Appellant similarly had pulled ML against his erect penis earlier at the waterpark and moved his waist side to side in the water.[5] ML testified that, while her brother slept, Appellant put his leg over and around her, and she then used her leg to remove Appellant's. Appellant tried spreading her legs apart by putting her leg around his and she closed her legs together to stop him. ML's brother testified he saw Appellant's leg on top of ML before ML's brother turned away and fell asleep.

ML testified as follows: as Appellant lay next to her, he turned her to face him, kissed her on the lips, and pushed his tongue into her mouth. Appellant moved ML to once again face toward her brother, lifted her shirt, and ran his hand over her breasts and buttocks under her clothes. Appellant then moved his hand between the back of her legs and inserted his finger into her vagina and, for about five minutes, moved his finger side to side as he penetrated her vulva. ML next remembered the light turning on in the room when her father and stepmother checked on them before they went to sleep.

JL testified he opened the door to the children's bedroom, turned on the light, and saw Appellant in bed with his children. JL noticed Appellant's leg

---

[5] ML did not report this conduct to anyone and Appellant was not charged with any offense.

4

was "wrapped around" ML and Appellant seemed "startled." JL saw Appellant "transition[ ] his leg off the top of [ML]" as they entered the room. Appellant's conduct struck JL as "odd," but JL said nothing because it was "common nature" for Appellant to be "hanging out with the kids" and because he "trusted" Appellant. KL testified she also saw Appellant's leg "wrapped around" ML. According to KL, Appellant "moved really quickly" when they opened the bedroom door, but it "wasn't a big deal" seeing Appellant in bed with the children because Appellant and the children used to watch movies and play guitar in Appellant's room when Appellant lived with JL and KL in Mississippi.

Before JL and KL left the room, ML told them she was "really hot" and asked if she could sleep with her father and stepmother, which would normally not happen unless ML was sick. KL testified ML "popped up" out of bed with a "terrified look on her face that I've never seen." JL testified ML "jumped out of bed" and was "hugging on" JL before the three laid down in the master bedroom. About five to ten minutes later, Appellant came into the master bedroom without knocking. JL testified Appellant was in a "panicky[ ] state" and asked, "Hey, is everything okay? Is everything good in here?" KL testified that Appellant asked, "What's wrong with [ML]? I heard her get up." JL further testified ML was unusually "clingy" throughout the night. KL further testified ML "laid on her dad's chest all night long and did not move, which she has never done."

 JL and KL both noticed changes in ML's behavior after that evening. KL noticed ML "wasn't acting herself" and "looked really scared" when ML got out of the car at the airport for the return flight home with Appellant. The children and Appellant were met by the children's mother when their flight landed in New Orleans, Louisiana. The next day, ML told her mother and a friend what Appellant did to her in Japan. ML's mother reported her daughter's allegations to JL and the St. Bernard Parish (Louisiana) police, who began an investigation. JL contacted Appellant's first sergeant and the matter was referred to the Air Force Office of Special Investigations.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of the three findings of guilty; the focus of Appellant's assignment of error is the credibility of the witnesses and factual sufficiency. Appellant claims ML was not a credible witness for the following reasons: (1) when testifying as to the facts underlying the specification of which Appellant was acquitted, ML was inconsistent about whether she felt Appellant's penis; (2) ML testified that Appellant never went to the unoccupied spare bedroom during the visit to JL's house, but

5

KL testified that Appellant initially entered the room when he first arrived; (3) ML was inconsistent and contradicted by JL and KL as to whether Appellant was on top of or under the covers of the bed on the night at issue; (4) ML was inconsistent about whether her brother was sleeping when Appellant touched her; and (5) at trial, "ML added a new and previously unreported act by [Appellant] at a water park" that she had not disclosed to investigators or trial defense counsel before trial. Appellant also challenges the credibility of JL and JL's son (ML's brother). We are not persuaded by Appellant's claims and conclude the convictions are legally and factually sufficient.

### 1. Law

We review issues of legal and factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted). "The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). While we must find that the evidence was sufficient beyond a reasonable doubt, it "does not mean that the evidence must be free of conflict." *Id.* (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)).

Appellant was convicted of Specifications 2–4 in violation of Article 120b, UCMJ. Specifications 2 and 3 alleged Appellant committed a sexual assault upon ML, which required the Government to prove beyond a reasonable doubt: (1) that Appellant committed a sexual act upon a child by causing penetration, however slight, of the vulva of the child with his finger and the mouth of the child with his tongue; (2) that at the time of the sexual act the child had attained the age of 12 years but had not attained the age of 16 years; and (3) that Appellant did so with the intent to gratify his own sexual

desire. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45b.b.(3)(b). Specification 4 alleged Appellant's sexual abuse of ML, which required the Government to prove beyond a reasonable doubt: (1) that Appellant committed sexual contact upon a child by touching directly the breasts and buttocks of the child, and (2) that Appellant did so with the intent to gratify his own sexual desire. *See MCM,* pt. IV, ¶ 45b.b.(4)(a).

**2. Analysis**

The testimony of ML provided convincing proof of each of the elements of Specifications 2–4, to include the elements that Appellant penetrated ML's vulva with his finger, penetrated her mouth with his tongue, and touched her breasts and buttocks, all with an intent to gratify Appellant's sexual desire. The testimony of ML's family lends support to ML's testimony. Appellant laid down in the same bed with ML instead of sleeping alone in the unoccupied room where KL told Appellant to go. Three witnesses—JL, KL, and ML's brother—testified that Appellant laid next to ML and saw Appellant's leg on top of or wrapped around ML. JL and KL both saw Appellant "quickly" move his leg when they checked on the children. Both testified ML "jumped" or "popped up" out of bed and slept in their bed rather than remain in bed with Appellant. Both testified Appellant entered the master bedroom unannounced to check on ML. Both observed changes in ML's behavior after the night in question.

Appellant argues the evidence is legally and factually insufficient to support the convictions because neither ML, JL, nor ML's brother were credible witnesses. While we have the independent authority and responsibility to weigh the credibility of the witnesses in determining factual sufficiency, we recognize that the trial court saw and heard the testimony. *See United States v. Moss*, 63 M.J. 233, 239 (C.A.A.F. 2006) (stating it is the members' role to determine whether testimony is credible or biased). Like the factfinder at trial, we weigh the evidence in the record and determine whether a discrepancy in a witness's testimony—including a lapse in perception, memory, or recall—resulted from an innocent mistake or a deliberate lie. *See United States v. Goode*, 54 M.J. 836, 844 (N.M. Ct. Crim. App. 2001). Additionally, the members may "believe one part of a witness' testimony and disbelieve another." *United States v. Harris*, 8 M.J. 52, 59 (C.M.A. 1979).

We have reviewed the entire record of trial and conclude there were no material discrepancies in any witness's testimony. While the members may have found ML was inconsistent about whether she felt Appellant's penis

with regard to the specification of which Appellant was acquitted,[6] we discern no meaningful conflict in ML's testimony with regard to the three specifications of which Appellant was convicted. We have considered the discrepancies noted by Appellant, along with biases and motives advanced by Appellant. Testimony "need not be completely consistent to still be sufficiently reliable to sustain a conviction, and we do not confine our analysis to merely the testimony of a single witness in performing our factual sufficiency review under Article 66, UCMJ." *United States v. McFadden*, No. ACM 38597, 2015 CCA LEXIS 520, at *11 (A.F. Ct. Crim. App. 18 Nov. 2015) (unpub. op.); *see also United States v. McElhaney*, 50 M.J. 819, 832 (A.F. Ct. Crim. App. 1999) (concluding evidence factually sufficient, in part, because the appellant's wife corroborated appellant's romantic relationship with victim notwithstanding appellant's claim that victim's testimony was implausible and inconsistent).

Considering the evidence in the light most favorable to the Prosecution, we find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of Specifications 2–4. Furthermore, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's convictions both legally and factually sufficient.

## B. Admission of "Bad Character" Evidence

Appellant claims the military judge committed plain error when she allowed ML's father to testify that Appellant stated he "wanted to have sex with anything he could or f**k anything with a hole in it" while visiting Japan. The Defense did not object to this testimony or ask for a limiting or curative instruction and none was given *sua sponte* by the military judge. We are not persuaded the military judge erred.

### 1. Law

A military judge's decision to admit or exclude testimony is reviewed for an abuse of discretion. *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted).

---

[6] The conduct of which Appellant was acquitted was charged between on or about 1 January 2013 and on or about 31 December 2013 when ML would have been between nine and ten years old. Proof of this allegation may have been impacted more than proof of Specifications 2–4 by the passage of time and by fading memory and recollection.

> [When] an appellant has not preserved an objection to evidence by making a timely objection, that error will be forfeited in the absence of plain error. A timely and specific objection is required so that the court is notified of a possible error, and so has an opportunity to correct the error and obviate the need for appeal.

*United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citations omitted). Under plain error review, an appellant has the burden of showing that there was error, that the error was plain or obvious, and that the error materially prejudiced a substantial right of the appellant. *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011) (citation omitted).

Military Rule of Evidence 401 establishes the standard for determining whether evidence is relevant and states: "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Military Rule of Evidence 402 generally provides that "[r]elevant evidence" is admissible unless one of four exceptions enumerated in the rule applies. Military Rule of Evidence 403 states that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." An appellant's own statement offered by the Government to prove the truth of the matter asserted in the statement is not hearsay and may be admitted against an appellant. Mil. R. Evid. 801(c), (d)(2)(A).

### 2. Analysis

We find Appellant has not demonstrated error. JL testified that during the "heated discussion" with Appellant at the cookout, JL became agitated thinking about "[t]hings that [Appellant] was speaking of in the gym over the last week and a half." Reflecting on their conversations, JL testified, "[a]s far as [Appellant] coming out to Japan, he had one thing in mind." Appellant told JL he "wanted to have sex with anything he could or f\*\*k anything with a hole in it." JL later testified that to the best of his understanding Appellant had not engaged in any sexual encounters during the trip to Japan prior to the offenses involving ML.

Evidence of Appellant's own statement of his indiscriminate desire to engage in sexual intercourse in Japan and that he had been unsuccessful in doing so was relevant under Mil. R. Evid. 401 to explain why Appellant would have selected ML to satisfy his sexual desire. In this contested case, a reasonable factfinder could have found that Appellant was attempting to satisfy his sexual desires with "anything," which by fair inference meant *anyone*, in-

cluding ML. *See United States v. Whitney*, ACM 32807, 2000 CCA LEXIS 55, at *5 (A.F. Ct. Crim. App. 22 Feb. 2000) (unpub. op.) (evidence that an appellant told a female victim about his sex life and bragged about the number of women he was intimate with, his sexual prowess, and the fact that some of his conquests were wives of commanders "set the scene to explain the circumstances leading up to the indecent assault."). We further find Appellant's statement made close in time to the offenses was not only probative to explain his actions with ML, but also relevant to show Appellant's intent to gratify his sexual desire. Thus, the military judge did not err when she did not *sua sponte* exclude JL's testimony about Appellant's sexual desires and lack of sexual activity during his trip.

We further find the probative value under Mil. R. Evid. 403 was not outweighed by other considerations. Appellant claims JL's testimony was inadmissible evidence of "bad general character" used to demonstrate that Appellant should be convicted because he acted in accordance with his character. We are not persuaded. Appellant's statement was more one of intent than propensity and overtly demonstrated Appellant's desire to engage in a sexual act during Appellant's visit. Trial counsel briefly referenced Appellant's statement in closing argument,[7] but no effort was made by trial counsel to use Appellant's statement as evidence of propensity to commit sexual misconduct or to show Appellant acted in accordance with a trait of general bad character. *See* Mil. R. Evid. 404(a)(1). We conclude Appellant's statement was used for a valid non-propensity purpose and was not so inflammatory as to be unfairly prejudicial. Thus, there was no error in its admission.

## C. Effect of Military Judge's Instructions

Appellant avers that two separate instructional errors had a "chilling effect" on the members and discouraged them from carrying out their responsibilities. We are not persuaded the military judge erred giving either instruction.

---

[7] Trial counsel argued,

> [E]ven though he had a girlfriend, [Appellant told JL] his plans for getting laid in Japan. That was not the [Appellant] that [JL] knew and . . . kind of helped raise. One might dismiss [Appellant's] comments about "f**king anything with a hole in it" if it wasn't a 100 percent accurate prediction of what [Appellant] was going to do that trip.

**1. Law**

"The question of whether a jury was properly instructed [is] a question of law, and thus, review is *de novo.*" *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002) (alteration in original) (citation omitted). Generally, a military judge has "substantial discretionary power" to decide whether to issue a jury instruction. *Id.* (citation omitted). The military judge is obligated to ensure that an appellant receives a fair trial and this obligation includes the duty to provide appropriate legal guidance. *See generally United States v. Wolford*, 62 M.J. 418, 420 (C.A.A.F. 2006) (citations omitted). We review unchallenged instructional error for plain error. *United States v. Blanks*, 77 M.J. 239, 241 (C.A.A.F. 2018) (citation omitted). Under the plain error standard, "Appellant has the burden of establishing (1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." *Knapp*, 73 M.J. at 36 (citing *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007)). "[T]he failure to establish any one of the prongs is fatal to a plain error claim." *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006).

Rule for Courts-Martial (R.C.M.) 913(a) vests the military judge with discretion to "give [to the members] such preliminary instructions as may be appropriate." Article 46, UCMJ, 10 U.S.C. § 846, gives panel members the "opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." One such regulation is Mil. R. Evid. 614(b), which allows

> members [to] examine a witness regardless of who calls the witness. Members must submit their questions to the military judge in writing. Following the opportunity for review by both parties, the military judge must rule on the propriety of the questions, and ask the questions in an acceptable form on behalf of the members.[8]

After the members have begun deliberating on findings, the "[m]embers may request that the court-martial be reopened and that portions of the record be read to them . . . . The military judge may, in the exercise of discretion, grant such request." R.C.M. 921(b).

---

[8] This empowerment of members of a court-martial to be "active trial participants as a matter of right is unique among federal criminal courts." *United States v. Hill*, 45 M.J. 245, 248 (C.A.A.F. 1996) (citations omitted).

### 2. Analysis

We find the military judge did not err, much less commit plain error, by instructing the members to be cautious about revealing their thought process in composing questions to witnesses or by informing them that their right to replay testimony was not unfettered.

#### a. Preliminary Instruction on Composing Questions

Turning to the first allegation of instructional error, Appellant claims the military judge erred during preliminary instructions when she told the members to avoid revealing their thought process or deliberations when composing questions to witnesses. The military judge further advised against "writing your question in a way that is telling us something we don't need to know . . . that's going through your mind." The military judge allowed, "You can ask a question that will get to some sort of fact, as opposed to putting in some editorializing." The Defense did not object to the instruction or request any additional instruction, and no member asked a question of a witness.

We disagree with Appellant's claim that there is little risk that a member's question would improperly reveal a member's thought processes because the procedures require members to put their questions in writing and each question is examined by the military judge and counsel before it may be asked in open court. The premise of Appellant's argument is that a member is at liberty to reveal his or her own thought processes to the parties and the military judge, and it is only if it were revealed to another member that there may be cause for concern. We are not persuaded.

The Court of Appeals for the Armed Forces has observed that the duty of a military judge to evaluate member questions is not merely to determine the "propriety of the questions" and "to consider whether questions are objectionable." *United States v. Hill*, 45 M.J. 245, 248 (C.A.A.F. 1996). More comprehensively, the military judge must be alert to signs that the "members or any one of them . . . departed from their required objective role as factfinders." *Id.* at 249. The responsibility is "a more holistic one -- whether 'the overall questioning . . . creates an impression or a substantial doubt that [they] had departed from [their] required character as . . . unbiased members of the court[.]'" *Id.* at 249 (alterations in original) (citing *United States v. Lamela*, 7 M.J. 277, 280 (C.M.A. 1979)). "[I]t is imperative that members, as the triers of fact, remain impartial and not form early opinions or prematurely jump to de facto deliberations via their interaction with witnesses." *Id.* at 248 (citations omitted).

We find the military judge's tailored preliminary instruction was a prophylactic way to forestall the members from departing from their objective role as factfinders during questioning of witnesses, and it was within her dis-

cretion to give. The tenor of her charge was that the members use caution when communicating their own thought processes so that they do not depart from their unbiased, impartial role—not unlike the military judge's instruction that "it is of vital importance that you keep an open mind until all the evidence has been presented and the instructions have been given." Thus, there was no error with regard to the first instruction challenged by Appellant.

### b. Clarifying Instruction on Replaying Testimony

As to the second allegation of instructional error, Appellant claims the military judge erred when she gave a clarifying instruction after trial defense counsel argued to the members that the evidence included "countless inconsistencies" and further stated to the members that, if they had questions about what a particular witness said, they had "*every right* to come back . . . and replay *any testimony that [they] want[ed].*" At the close of her procedural instructions on findings, the military judge *sua sponte* instructed the members that their right to replay testimony was more circumscribed than the Defense had stated.

> Now, regarding what the defense counsel argued about[,] you have a right to hear testimony back, you certainly have a right to request it, but I won't entertain any request to hear testimony back until you've been deliberating and you really focus on whatever it is that you want to hear so that you've discussed the evidence, you've talked, and that you can narrow whatever it is that you may want to hear. Then you can ask for testimony to be replayed. It's not a common thing to have testimony replayed. It's a rare occurrence.

The Defense did not object to the instruction or request any additional instruction. The panel did not request the military judge to reopen the court-martial to replay any portion of a witness's recorded testimony.

We find the military judge appropriately remedied the incorrect Defense argument that the members had an unfettered right to replay testimony upon request. As a matter of law, the "military judge may, *in the exercise of discretion*, grant such request." R.C.M. 921(b) (emphasis added). The military judge was within her discretion to not entertain a request to replay testimony until the members first deliberated and discussed the evidence and then focused on the testimony they wanted to hear again. Though under other circumstances it might be inappropriate to inform the members that replaying testimony is uncommon and "a rare occurrence," we find it was within the military judge's discretion to do so in this case where the Defense's overzealous invitation may well have created the false expectation among the mem-

13

bers that replaying testimony was customary or even required in order for the members to perform their duty as the factfinder. Thus, there was no error with regard to the second instruction challenged by Appellant, and we conclude there is no merit to this assignment of error.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.[9]

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

---

[9] Although not raised by the parties, we note an error in the promulgating order where the charged article is incorrectly identified as Article "120" rather than "120b." We direct the publication of a corrected court-martial order to remedy this error.