# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

———————————

## No. ACM 39582

———————————

### UNITED STATES
*Appellee*

**v.**

### Wesley A. BRAMMIER
Captain (O-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 11 September 2020

———————————

*Military Judge:* Andrew Kalavanos (arraignment); W. Shane Cohen.

*Approved sentence:* Dismissal and confinement for 39 months. Sentence adjudged 27 July 2018 by GCM convened at Tyndall Air Force Base, Florida.

*For Appellant:* Major David A. Schiavone, USAF; Philip D. Cave, Esquire; J. Thomas Province, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Dayle P. Percle, USAF; Mary Ellen Payne, Esquire; Deniz Gunaydin (legal intern).[1]

Before POSCH, RICHARDSON, and MEGINLEY, *Appellate Military Judges.*

Senior Judge POSCH delivered the opinion of the court, in which Judge RICHARDSON and Judge MEGINLEY joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

[1] Mr. Gunaydin was a legal intern with the Air Force Legal Operations Agency and was at all times supervised by attorneys admitted to practice before this court.

_____

POSCH, Senior Judge:

A general court-martial composed of a military judge sitting alone convicted Appellant, contrary to his pleas, of sexual assault of CE in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[2] Appellant was sentenced to a dismissal, confinement for 39 months, and a reprimand. Before the convening authority took action, he waived the mandatory forfeiture of Appellant's pay and allowances for the benefit of Appellant's spouse and dependent children for a period of six months, upon release from confinement or expiration of term of service, whichever was sooner, with the waiver commencing on 10 August 2018. At action, the convening authority approved the adjudged sentence except the reprimand.

Appellant initially raised four issues on appeal: (1) whether the evidence is legally and factually sufficient to support the conviction; (2) whether Appellant is entitled to relief for multiplicity or unreasonable multiplication of charges;[3] (3) whether trial defense counsel provided ineffective assistance of counsel by failing to prepare Appellant to testify and to call Appellant's wife to testify on Appellant's behalf in findings;[4] and (4) whether the military judge erred "when instructing himself" on the definition of "incompetent person" impaired by alcohol when the specification alleged "bodily harm."[5] With respect to issues (2) through (4), we have carefully considered Appellant's contentions and find they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Appellant also filed a supplemental assignment of error (AOE) claiming relief under *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002), is warranted due to the violation of the 18-month standard for appellate review in *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006).

_____

[2] All references in this opinion to the Uniform Code of Military Justice and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] Appellant was charged with penetrating CE's vulva with his penis, finger, and tongue, in Specifications 1–3, respectively, of the Charge. Although the military judge acquitted Appellant of Specifications 2 and 3, Appellant claims prejudice from the burden of defending against three specifications at once.

[4] Appellant did not testify in his own defense. In a colloquy with the military judge, Appellant acknowledged his decision was a "voluntary choice."

[5] Appellant raises issues (2) through (4) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

We find Appellant's conviction both legally and factually sufficient, and no error materially prejudicial to the substantial rights of Appellant occurred. Thus, we affirm the findings and sentence.

## I. BACKGROUND

Appellant and his wife, CB, became close friends with CE and her husband, an Air Force captain, when they were stationed together at Tinker Air Force Base (AFB), Oklahoma. Both families had young children, and the families frequently spent time together with their circle of friends. CE had a particularly close friendship with CB and they spent time together at least once a week. In the summer of 2014, CE's husband deployed and the wives grew closer and spent more time together.

The month before CE's husband redeployed to Tinker AFB, on 25 October 2014, CE and her two children gathered with friends at Appellant's home to celebrate CB's birthday. In the evening, as CE's children, ages two and four, slept on the bed in the upstairs guestroom, CE and others drank alcohol, including shots of whiskey, downstairs. CE had consumed "[q]uite a bit" of alcohol and "was intoxicated" in the few hours she was drinking. By the end of the evening she "was pretty drunk," and "could barely walk." Appellant's and CB's baby was also sleeping upstairs. During the party, CE heard the baby monitor go off and prepared a bottle. She told CB, "Don't worry about it. It is your birthday. I will go take care of her."

While CE was upstairs feeding and comforting the baby, she noticed Appellant in the room. She felt "a little guilty" because she "was intoxicated and holding an infant." Thinking this might upset Appellant, CE bent down to put the baby back in the crib, but then she stumbled and lost her footing as she tried to stand up. CE leaned to one side and stopped herself from falling at the same time Appellant grabbed onto her to keep her body from hitting the floor. Appellant then helped CE walk to the guestroom where her children were sleeping, and where she planned to spend the night as she and her children had done many other times.

CE remembered Appellant helping her to the bed to lay down. She remembered thinking to herself, "[O]kay, I am done for the night. I am too drunk, [I] can't walk, I'm in bed with my kids, and I'm just kind of checking out at this point." CE then felt her pants coming off and, at first, was "still not thinking much of it." CE testified while her eyes were closed, her pants were removed completely, exposing her underwear. CE did not believe she was blacked out drunk, telling the court, "I remember saying no after feeling my pants being taken off. So, I feel like if I would have blacked out, I wouldn't have remembered the rest of the night. . . . A lot of it is blurry and some of it is vivid . . . ."

CE testified she was unsure if Appellant performed oral sex on her or if he penetrated her vulva with his fingers.

The next thing CE remembered was "feeling kind of coming to, just not really knowing what [was] going on but feeling incredibly inappropriate, [and] trying to grasp what was happening." As she lay on her back with her legs slightly off the side of the bed, she felt an "inappropriate touching" between her legs, and initially "wasn't sure what was going on." However, CE recognized Appellant's face above her and when she saw Appellant's hands on either side of her head she "realized what was happening and [she] told him to stop and that his wife was downstairs." CE explained "when [she] saw [Appellant's] hands next to [her] and [she] saw his face over [hers], [she] felt penetration and at that point [she] knew it was [Appellant's] penis." When CE told Appellant to "stop," Appellant responded, "But you let [Captain NB]," in reference to their mutual friend who at the time was celebrating downstairs with CB and other guests. CE replied, telling Appellant "No. That didn't happen."[6] CE recalled Appellant became "frustrated, just kind of huffing." As he left the guestroom, Appellant said to CE, "[T]his was the sexiest thing he had ever done."

CE was certain Appellant penetrated her vulva with his penis. On this point, the military judge and CE had this exchange during her findings testimony:

> Q [Military Judge]. Help me understand how you can be so certain of that given your level of intoxication?
>
> A [CE]. Because I remember thinking to look for his hands. I felt inappropriate touching down there, but I wasn't sure what was going on. I remember looking for his hands and seeing both of his hands free, both on the bed, one on either side of me, and I remember seeing his face, so at that point I knew it was his penis.
>
> Q. You used the word touching. What does that word mean to you when you are describing that?
>
> A. I felt skin on skin contact. I felt someone else other than me touching down there.
>
> Q. Touching down there or actually in the vaginal canal?

---

[6] Appellant introduced evidence of a perception among some Air Force personnel that CE was involved in an affair with Captain (Capt) NB. Both denied any romantic relationship or physical intimacy. CE testified she reported the gossip to her deployed husband and assured him there had been no sexual conduct between her and Capt NB.

> A. At first I wasn't sure. At first I felt inappropriate touching. It took me a minute to kind of realize what was going on, and then when I saw both of his hands, I realized, and I felt penetration.
>
> Q. Is there any chance the penetration you were feeling was a tongue or a finger?
>
> A. I know that it was his penis. What I remember, it was his penis inside of me.
>
> Q. Okay. Any doubt in your mind?
>
> A. No doubt in my mind.

From the vantage of CB and her other guests, nothing unusual occurred on the night of CB's birthday celebration or the next day when CE and her children went home. CE was "incredibly drunk" and fell asleep almost immediately after Appellant left the guestroom. She remembered CB and Capt NB enter the guestroom to check on her sometime after Appellant departed. CB pulled the covers off of CE, and immediately put them back on. CE heard CB remark, "Nope, she's done for the night." In the morning, CE woke up and vomited, and then she fell back to sleep for several more hours before returning home. Later in the afternoon, CE posted a picture on Facebook that she took of all the adults celebrating at the birthday party. CE captioned her posting, "I LOVE these people to the moon and back!" CB posted a comment about the picture and party: "Another successful night and a not so successful morning!" to which CE responded: "Lol! Agreed! I'm still suffering. Just means it was a good night!!!"

That same afternoon, CE called her childhood girlfriend, BN, to talk about what happened to her the previous night. CE sounded distraught and told BN that she was unsure what to do about the incident. At trial, BN testified she knew of the close relationship that developed between CE and CB and their families, and BN recounted what CE told her about the incident with Appellant in the guestroom. CE explained she had gone upstairs to check on one of the children, and that Appellant "raped her" after he helped CE into bed and took off her pants. During the call, CE was "very upset" and crying, almost "hyperventilating."

Not long after CE's conversation with BN, CE decided not to tell others what Appellant had done, even keeping the incident from her husband. It weighed heavily on her what might happen if she told CB or her own husband. CE "knew that if [she] said something a lot more people would [be] hurt" including both families. She knew CB's relationship with Appellant "would be over" and "[Appellant] would lose his career." She worried that CB "[didn't] have a college degree . . . so there would be no financial support" for CB's family. And if CE told her husband, he "would be incredibly upset" with Appellant, and he would probably suggest she sever ties with CB.

CE's husband testified about a phone call he received from his wife at the end of October 2014, one month before he redeployed and returned home. He recalled CE "was begging [him] to come home immediately," and "[i]t was very hard to understand what she was saying because she was crying so much." Even at the end of the phone call, she still had not calmed down, and he could not understand why she was so upset. After that phone call, he returned from a flying mission to find 20 to 30 missed phone calls or texts from CE with "frantic" messages that she needed to get in contact with him. "Every phone call that [they] had after that, she would cry or she would be upset or say . . . 'I need you here. I can't do this anymore. I don't want to do this anymore.'"

In the days and months after the incident in question, CE resolved to keep what happened from her husband and their circle of friends, testifying she "thought that [she] could handle that, [and] that [she] could pretend that it didn't happen and just block it out." On 2 November 2014, about a week after the birthday party, the same circle of friends including Appellant got together and watched movies. CE posted a comment about the get-together on her Facebook page, captioning it, "Scary movies with my fave people." Appellant was among the people whom she included in the post by tagging Appellant's name. CE also continued her relationship with CB who was her "rock" while CE's husband was deployed, and their children remained friends. CE remained close to CB after CE's husband redeployed, and they remained friends when Appellant deployed and after CE's husband deployed again the next year.

CE maintained her resolve for a couple of years after the birthday party. CE testified how her relationship with her husband changed because of the incident and her decision to keep it to herself. They "started arguing over little things[,] and things that carried little weight kind of turned into bigger things that became detrimental to [their] marriage." CE felt her husband was not emotionally supportive. She felt as though "the end of [their] relationship was inevitable" and she "just didn't see [the two of them] getting any better." CE's husband testified about marital problems that were manifest in his lack of trust of CE, and CE's explosive anger when they argued about matters that seemed trivial to him at the time, and that had not angered his wife before.

In contrast to the changes in CE and her husband's relationship after the incident, the friendship between the families continued as usual for two years. That changed in October 2016 when the wives had a falling out after CB's family changed duty stations. CE was upset when Appellant and CB's family left without saying goodbye or giving CE and her family an opportunity to say farewell. CE testified she was upset because she

> felt that [she] was holding a secret for [Appellant and CB's] family. The secret that [she] was holding could make their family fall apart, and [she] just felt that [she] cared enough to put

[her]self in that kind of position that [she] didn't mind bending over backwards for [her] friends if it meant that they were happy. So, [she] was upset that [CB] couldn't reciprocate that simply just by coming over and saying goodbye.

CE kept what happened a secret for nearly two-and-a-half years. That too changed in March 2017 when Appellant contacted CE via Facebook Messenger after Appellant and his family were settled at his new duty station. CE was surprised by this contact as she had no friendship with Appellant, and the last time they communicated was before Appellant and his family moved away. CE and CB were no longer speaking with each other and CE felt as though Appellant "was checking on [her]," and she "was curious to know why." CE and Appellant engaged in small talk about their families, but she did not then confront Appellant about the incident at his wife's birthday party. Around the same time CE exchanged messages with Appellant, CE thought about telling her husband about the incident at CB's birthday party because they "were bickering a lot," and it seemed as though "[t]here were things that [she] felt like he just did not understand, and at this point, [she] felt like he was almost done trying to understand [her]." CE also "felt like [she] was lying" to her husband and "the weight of this lie . . . affect[ed] [their] marriage." She explained that the secret she kept was "a lie by omission, so [she] felt like [she] needed to say something" to her husband.

In late March 2017, CE told her husband about the sexual assault after an argument when they quarreled for several hours after he was late returning home from the gym. CE's husband explained at trial how "the argument just snowballed from there." He asked his wife as he had on many other occasions when they argued, "What are you doing? What is going on here? What do you need from me? I really don't understand." After the argument died down and CE and her husband went to separate rooms to sleep, CE thought "[m]aybe if [she would] tell him what happened, he will understand [her]. He will see why things bother [her] or certain things upset [her] and maybe that will just open his eyes to where [she was] at[,] and what [she] need[ed] from him."

CE's husband gave an account of what happened next. He related how his wife approached him and "just started bawling." CE said she needed to tell him something, but first he had to "promise [her] that [he wouldn't] hurt anyone." Her husband agreed, and CE told him that "[s]omeone hurt [her]" and then explained "that [Appellant] raped her." The morning after she disclosed the incident to her husband, CE decided to make a restricted report of sexual assault. Two or three weeks later, she changed the report to unrestricted and an investigation by special agents of the Air Force Office of Special Investigations (AFOSI) ensued.

CE was crying and shaking and became physically ill when she made the initial unrestricted report. She vomited multiple times in a trashcan as she recounted what happened. The AFOSI agents suggested to CE that she participate in a recorded phone call with Appellant, which she agreed to do in her home with the agents and her husband present.

At trial, the Prosecution played the recorded conversation with Appellant.[7] CE confronted Appellant, stating she "kn[e]w that [Appellant] had sex with [her] when [she] was drunk at [Appellant's] house" on the night they celebrated his wife's birthday. CE described for Appellant her memory of events that unfolded after CE went upstairs to check on the baby. The information she related to Appellant over the phone was in all material respects the same as she later described in her trial testimony. In response, Appellant repeatedly denied any sexual contact with CE or helping her walk to his guestroom. Appellant told CE he "[didn't] remember being with [her] or around [her]" in the baby's room that night. He asserted that CE went upstairs because the baby was crying, but claimed he remembered only "waking up in [the baby]'s room and then going back to bed," and not "hav[ing] any recollection of doing anything with [CE] whatsoever."[8] CE confronted Appellant with the words she heard him say to her when she told him to stop. She told Appellant how she recalled Appellant remark "that [CE] let [Capt NB] [have sex with her], like [Appellant] used it almost as a justification" for Appellant to have sex with her as well.

Appellant repeatedly challenged CE's memory and asserted that if the incident happened as she described, then "it doesn't make sense that [CE] wouldn't like scream to somebody or say get off [her] and like push [Appellant] off." Appellant questioned "if [the incident] was on [CB]'s birthday where there had to [have] been other people, like how would [he] have even been able to do that?" Appellant asserted "that—that just does not sound like something [he] would ever do . . . . Like if that did happen, . . . [he was] truly sorry." He told her "[i]f that really did happen . . . [he didn't] even know what to say." Appellant disavowed any recollection of telling CE when he left the guestroom that his conduct with her that night was the "sexiest" thing he had ever done, or

---

[7] The quotes from this and two subsequent phone conversations are from the transcription of the playback of the recordings in the Prosecution's findings case.

[8] In the recorded conversation played in the Prosecution's case, CE asked Appellant what he remembered of that night. Appellant replied, "All I remember is waking up in [the baby]'s room on the chair and then coming to bed like in the middle of the night. Like that is it. That's all I remember. I remember waking up in [the baby]'s room and thinking how the f**k did I get in [the baby]'s room like on the chair. And then I came in and went to bed with [CB] and then like woke up and, I mean, that was it."

words to that effect. When confronted Appellant replied, "Really? No, that doesn't sound like me."

Within a half-hour after the phone call ended and after the AFOSI agents left CE's home, Appellant called CE back and gave a very different account of his memory of the incident and his actions. CE recorded this second conversation using her husband's phone, and the Prosecution introduced the recording during CE's testimony. Unlike before, Appellant explained he "truthfully remember[ed] every single detail" including the color of underwear CE was wearing when he helped remove her pants after he assisted her to the guestroom. Appellant volunteered at the beginning of the second conversation:

> I have to admit that I do remember everything. I was just a little embarrassed truthfully to kind of come out with it. But after, you know, thinking it over, it behooves me so you get closure on it as well. So, I do actually remember everything. We went upstairs in [the baby]'s room. She was crying. You were putting her to bed, and then I helped put her to bed the rest of the way. And then my—I got kind of mixed signals from you because we were kind of touching each other, not like sexually, but just touching each other. And then my whole point was to go put you to bed because I knew you were drunk, and I went to take your pants off and I went to go get shorts for you, but then after seeing your body, I thought we were getting mixed signals and then I actually started eating you out.

Appellant explained how he performed oral sex on CE with his tongue and also put his fingers in her vagina, and then they kissed; but he denied any other sexual conduct. Appellant insisted he "thought [they both] had consented," later saying he knew that she was "drunk," but he was "not going to sit here and say that is consensual." During the phone call, CE insisted that she felt Appellant penetrate her vagina with his penis,[9] but Appellant was adamant that she felt his fingers. Appellant maintained he was never on top of CE and they did not have sexual intercourse, explaining that after he performed oral sex they were kissing and he "went to go take [his] pants off," but stopped when CE told Appellant, "No, [CB] is downstairs." At that point, Appellant told CE on the phone that he "started buttoning [his] pants back up," and was "glad [he] did, because [he] remember[ed] vividly at that moment . . . [CB] and [Capt NB] came up the stairs" to check on CE. Appellant related that he "ran into [the baby]'s room" and pretended to be asleep in a chair. It was

---

[9] CE told Appellant, "I honestly remember you like being on top of me and inside of me. I remember like looking at your hands and seeing both of your hands free and you were like inside of me."

then that Appellant realized he "could've gotten into some deep trouble, and that is not who [he] was, so then [he] went to bed" because "[he] was so f**king nervous about what [he] had almost just done." Appellant acknowledged during the phone call that before leaving the guestroom he told CE that his conduct with her was the "sexiest" thing he had ever done, explaining he said this because CE was "very good-looking" and "very attractive," and Appellant had just read a book about how to please a woman.

The Prosecution introduced evidence of a third recorded phone conversation, one Appellant had with Capt NB six days after the two phone conversations between Appellant and CE. Capt NB testified that CE had recently disclosed to him that Appellant sexually assaulted her at the birthday party, and that Capt NB might be contacted by AFOSI agents because he was at the party when it happened. The AFOSI agents contacted Capt NB and he agreed to participate in a recorded phone call with Appellant. At the beginning of the conversation, both Appellant and Capt NB manifested awareness that CE had recently confronted Appellant about a non-consensual sexual encounter on the night of CB's birthday party. Appellant told Capt NB that he "didn't do anything" with CE on the night of CB's birthday party. Appellant related he told CE "nothing happened" between him and CE when they recently spoke to each other on the phone. Appellant also expressed considerable concern for his marriage and career.

The Prosecution also introduced evidence of a fourth conversation Appellant had about the incident in question after the three recorded phone calls. Appellant's then-squadron commander, Lt Col KM, testified about a conversation in his office that Appellant initiated. Appellant's general description of what happened tracked CE's testimony at trial up to the point that Appellant helped CE to the guestroom. Appellant explained he had hosted a party at his home with a close-knit group of friends, including CE, and that he did not have much to drink. At one point after he heard the baby monitor go off, CE went upstairs to go check on one of his children, and Appellant later followed her upstairs. Lt Col KM recalled that Appellant said he helped CE get to sleep, and at one point helped CE change her clothes, and that was all that happened in the guestroom.

At trial, the Prosecution presented CE's testimony and the testimony of her close friend, BN, who related how CE called her on the phone and told her that Appellant "raped her" at a birthday celebration for Appellant's wife. The Prosecution also presented the testimony of CE's husband who described the frantic phone calls and messages he began receiving at his deployed location beginning in late October 2014. Both CE and her husband testified about marital

problems that began around this time. The Prosecution also presented Appellant's inconsistent statements to CE and Capt NB, and Appellant's conversation with Lt Col KM.

Appellant defended the case principally on grounds that no sexual intercourse took place and that either CE was a willing participant in the sexual conduct that did occur, or that Appellant was reasonably mistaken as to CE's consent to engage in sexual activity. In this appeal, Appellant claims the evidence showed he had a consensual sexual encounter with CE, specifically that he performed oral sex on CE and penetrated her vulva with his fingers, but that there was absolutely no penetration of her vulva by his penis. Appellant maintains that CE's recollection of events was unreliable if not entirely fabricated, and claims "CE's false report of rape may have saved her marriage."

With this background and Appellant's claims at trial and on appeal, we consider the legal and factual sufficiency of the evidence.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

As charged, Appellant was convicted of sexual assault by bodily harm in violation of Article 120(b)(1)(B), UCMJ, 10 U.S.C. § 920(b)(1)(B), which required the Prosecution to prove two elements beyond a reasonable doubt: (1) that Appellant committed a sexual act upon CE by penetrating her vulva with his penis; and (2) that Appellant did so by causing bodily harm to CE, to wit: penetrating her vulva with his penis. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(3)(b). "'[B]odily harm' means any offensive touching of another, however slight, including any nonconsensual sexual act." *MCM*, pt. IV, ¶ 45.a.(g)(3). With regard to consent, the statute explains,

> The term 'consent' means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue shall not constitute consent.

*MCM*, pt. IV, ¶ 45.a.(g)(8)(A). The statute further explains that "[a] sleeping, unconscious, or incompetent person cannot consent." *MCM*, pt. IV, ¶ 45.a.(g)(8)(B). "Lack of consent may be inferred based on the circumstances

of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist only because of another person's actions." *MCM*, pt. IV, ¶ 45.a.(g)(8)(C).

A Court of Criminal Appeals may affirm only such findings of guilty "as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). "Article 66(c) requires the Courts of Criminal Appeals to conduct a *de novo* review of legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

### 2. Analysis

The focus of Appellant's assignment of error is the reliability of CE's memory and her veracity when she described what happened in Appellant's guestroom. Appellant claims that CE's testimony and other evidence is insufficient to support a conviction for sexual assault. To this end, Appellant gives reasons why the evidence falls short of proof beyond a reasonable doubt: (1) CE's testimony is unworthy of belief because her consumption of alcohol led to

significant parts of her memory of events being irretrievably lost, and details of the incident were suggested to her by the AFOSI agents;[10] (2) CE's interaction with CB, Appellant, and their circle of friends in the days and months after the incident in question belie her claim of sexual assault; (3) if CE admitted to a consensual sexual encounter with Appellant, it would end two marriages and break apart their families; (4) CE's reporting to law enforcement was precipitated by marital difficulties and an argument with her husband, after which "the report fixed the marriage;" and (5) CE told the AFOSI agents that several weeks after the incident in question, she went to a physician to be tested for a sexually transmitted disease, but no evidence was produced at trial to corroborate this contention.

The sufficiency of Appellant's conviction for sexual assault turns on whether the Prosecution proved beyond a reasonable doubt that CE's recollection that Appellant penetrated her with his penis was correct, and that she did not consent. Furthermore, if shown by some evidence, mistake of fact as to consent is a defense to sexual assault. *See* Rule for Courts-Martial (R.C.M.) 916(j)(1). It requires that an appellant, due to ignorance or mistake, incorrectly believed that another consented to the sexual conduct. *See id.* To be a viable defense, the mistake of fact must have been honest and reasonable under all the circumstances. *See id.*; *see also United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998) (quoting *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F 1995)). The burden is on the Prosecution to prove beyond a reasonable doubt that mistake of fact as to consent did not exist. *See* R.C.M. 916(b)(1); *see also United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019).

We find a rational factfinder would have found beyond a reasonable doubt the essential elements of sexual assault and that Appellant did not labor under an honest and reasonable belief that CE consented to the charged sexual act. CE's memory and recall of the incident established the elements of the offense and discount Appellant's defense of ignorance or mistake. The substance and timing of CE's report to BN cast considerable doubt on Appellant's argument that CE contrived a false narrative of sexual assault nearly two-and-a-half years later to mend her relationship with her husband and save their marriage. The testimony of BN, with whom CE maintained a close relationship since they were children, established that CE called her friend on the phone

---

[10] In his appeal, Appellant gives an example of the "help" CE received from an AFOSI agent to recall what happened. An agent asked CE, "When [Appellant] was inside you, where were his hands?" CE answered that question by asking the agent, "I think on the bed?" Appellant claims CE adopted that answer, later testifying she knew that the Appellant had penetrated her with his penis because she saw his face and his hands were on the bed: "I remember thinking to look for his hands, and I remember seeing both of his hands on either side of me. So, at that point, I knew what was happening."

and described how Appellant "raped her" at a birthday celebration for Appellant's wife the previous night. We find no genuine question was raised at trial about BN's veracity, or her recollection of what CE related to her and the distress BN heard in CE's voice in that phone call. A rational factfinder would also be convinced of Appellant's guilt even if the behavioral changes CE's husband observed in his wife beginning in late October 2014 were caused by other circumstances and not just Appellant's actions with CE, especially because CE began expressing a desperate need for her husband during the time the incident occurred.

Appellant made incriminating statements to CE and others before trial, including some statements he may have intended to be exonerating. Appellant maintained no penile penetration occurred when CE repeatedly challenged him that it did. Appellant related two contrary accounts of the incident in question in recorded phone calls with CE. Considered together, Appellant's narratives showed consciousness of guilt and raised substantial doubt about Appellant's honesty and the candor of his denials. At first, Appellant claimed no memory "whatsoever" of interacting with CE upstairs in the nursery and disavowed any contact with her later in his guestroom. After CE confronted Appellant with her memory of the sexual assault, Appellant questioned why CE did not scream and how his guests could be unaware of what happened if the incident happened as she described. A moment later, Appellant called CE back, asserting he "remember[ed] everything" down to the color of CE's underwear when he helped remove her pants as she laid down to sleep. Appellant then admitted to sexual acts with CE, which could lead a rational factfinder to conclude that Appellant committed the sexual assault in the manner that CE related in prior statements to BN, her husband, and agents of the AFOSI.

As between CE's prior consistent statements and sworn testimony that suffered from minor defects in perception and recall on the one hand, and Appellant's narratives that were laden with deceit on the other, a rational factfinder could be convinced beyond a reasonable doubt of CE's account of what happened and that Appellant was not mistaken as to consent. We have reviewed the entire record of trial and conclude there were no material discrepancies in any witness's testimony. We discern no meaningful conflict in CE's testimony on the critical issues of penetration and consent. A reasonable factfinder could have found CE was certain that she felt penetration by Appellant's penis and not his fingers.

A rational factfinder could also find from the circumstances immediately prior to the sexual act that Appellant did not have CE's freely given agreement to sexual intercourse with Appellant, and thus the Prosecution proved bodily harm beyond a reasonable doubt. We have considered the discrepancies noted by Appellant, along with motives advanced by Appellant. Testimony "need not

be completely consistent to still be sufficiently reliable to sustain a conviction, and we do not confine our analysis to merely the testimony of a single witness in performing our factual sufficiency review under Article 66, UCMJ." *United States v. McFadden*, No. ACM 38597, 2015 CCA LEXIS 520, at *11 (A.F. Ct. Crim. App. 18 Nov. 2015) (unpub. op.); *see also United States v. McElhaney*, 50 M.J. 819, 832 (A.F. Ct. Crim. App. 1999) (concluding evidence factually sufficient, in part, because the appellant's wife corroborated his romantic relationship with the victim notwithstanding the appellant's claim that the victim's testimony was implausible and inconsistent).

While we have the independent authority and responsibility to weigh the credibility of the witnesses in determining factual sufficiency, we recognize that the trial court saw and heard the testimony. *See United States v. Moss*, 63 M.J. 233, 239 (C.A.A.F. 2006) (stating it is the members' role to determine whether testimony is credible or biased). Like the factfinder at trial, we weigh the evidence in the record and determine whether a discrepancy in a witness's testimony—including a lapse in perception, memory, or recall—resulted from an innocent mistake or a deliberate lie. *See United States v. Goode*, 54 M.J. 836, 844 (N.M. Ct. Crim. App. 2001).

Viewing the evidence in the light most favorable to the Prosecution, we find beyond a reasonable doubt that a rational factfinder could have found Appellant guilty of all the elements of the offense of sexual assault and that Appellant had no mistake of fact as to consent, and that the evidence is legally sufficient to support Appellant's conviction. Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we also conclude the evidence is factually sufficient and are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction both legally and factually sufficient

## B. Timeliness of Appellate Review

Appellant claims that *Tardif* relief is warranted due to the violation of the third *Moreno* standard. We decline to grant such relief.

### 1. Law

We review de novo whether an appellant has been denied the due process right to a timely appellate review. *Moreno*, 63 M.J. at 135 (citations omitted). A presumption of unreasonable delay arises when appellate review is not completed and a decision rendered within 18 months of a case being docketed. *Id.* at 142. A presumptively unreasonable delay triggers an analysis of the four factors laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted). A presumptively unreasonable delay satisfies the first factor,

but the Government "can rebut the presumption by showing the delay was not unreasonable." *Id.* at 142. Assessing the fourth factor of prejudice, we consider the interests of "prevention of oppressive incarceration," "minimization of anxiety and concern of those convicted," and "limitation of the possibility that . . . grounds for appeal, and . . . defenses . . . might be impaired." *Id.* at 138–39 (citation omitted).

**2. Analysis**

Appellant's case was originally docketed with the court on 10 December 2018. Rendering a decision after 10 June 2020 is therefore presumptively unreasonable. The reasons for the delay include the time required for Appellant to file his brief on 14 May 2019 and the Government to file its answer on 25 July 2019. Appellant did not assert his right to a timely appellate review at any time before the supplemental AOE was filed on 28 July 2020 and answered on 31 August 2020. In that AOE, he made no specific claim of prejudice, and we find none.

Finding no *Barker* prejudice, we also find the delay is not so egregious that it "adversely affects the public's perception of the fairness and integrity of the military justice system." *See United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). As a result, there is no due process violation. *Id.*

Regarding Appellant's specific claim to *Tardif* relief, we determine that no such relief is warranted in the absence of a due process violation. *See Tardif*, 57 M.J. at 223–24; *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016). In *Tardif*, the United States Court of Appeals for the Armed Forces recognized that "a Court of Criminal Appeals has authority under Article 66(c) to grant relief for excessive post-trial delay without a showing of 'actual prejudice' within the meaning of Article 59(a)." 57 M.J. at 224 (citation omitted). Furthermore, we as a service Court of Criminal Appeals are required by Article 66(c), UCMJ, to determine which findings of guilty and the sentence or part thereof "should be approved." Article 66(c), UCMJ; *see Tardif*, 57 M.J. at 224. Considering all the facts and circumstances of Appellant's case, we decline to exercise our Article 66(c), UCMJ, authority to grant relief for the delay in completing appellate review.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the findings and the sentence are **AFFIRMED.**

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court